EVANS et al., Appellants,

v.

**OHIO STATE UNIVERSITY, Appellee.**

[Cite as *Evans v. Ohio State Univ.* (1996), 112 Ohio App.3d 724.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 95API08–965.

Decided July 23, 1996.

726

728

*Zellmer & Gruber, James R. Douglass* and *Beth Z. LaRue,* for appellants.

*Betty D. Montgomery,* Attorney General, *Peggy W. Corn* and *Catherine M. Cola,* Assistant Attorneys General, for appellee.

DESHLER, Judge.

This is an appeal by plaintiffs, Carol Evans, individually, and as guardian and next friend of her daughter, Stephanie Foucher ("Stephanie"), from a judgment of the Ohio Court of Claims finding in favor of defendant, the Ohio State University, in a negligence action.

On April 25, 1994, plaintiffs filed a complaint against defendant, alleging that James Waites, a 4–H volunteer counsellor and judge, utilized his position as a 4–H advisor to lure Stephanie, a minor, to his residence, where he sexually assaulted her on May 30, 1992. It was averred that, notwithstanding the fact that defendant knew or should have known of Waites's known propensities to utilize his position as a 4–H advisor to assault minor children, defendant continued to retain Waites without adequate supervision and to hold him out as a reliable and competent member of the 4–H staff. The matter came for trial before the Court of Claims beginning on February 13, 1995.

Pursuant to R.C. 3335.36, defendant, through the College of Agriculture, conducts educational programs in conjunction with the Ohio Cooperative Extension Service ("extension service"). The extension service is an educational arm of various land grant universities in the United States, and it conducts educational activities related to agriculture, home economics, natural resources, family living and youth development. 4–H is the public name of the youth development effort within the extension service. There is an extension office in every Ohio county and defendant employs agents in these offices to coordinate and operate its programs, including 4–H. The central offices for the 4–H organization are at the Ohio State University in Columbus, Ohio.

At the county level, 4–H is organized, in part, through different committees. At the head of this committee structure is the 4–H committee, which is responsi-

ble for the final policy review of other committees. In addition to the 4–H committee, there are various advisory committees, including a saddle horse committee, dairy committee, market animal committee, small animal committee and home economics committee. There are also numerous 4–H clubs formed at the local county level. Each club has an organizational advisor, also known as a head advisor, as well as other volunteer assistant advisors. In order to become an advisor, an applicant must submit a written application with references. The county extension agent keeps a list of official 4–H volunteers.

In 1981, James Waites became a volunteer advisor for a 4–H club in Lake County, Ohio. Waites had two children in the 4–H program at the time. In 1984, he served on Lake County's 4–H market livestock committee.

In November 1984, Waites pled no contest and was convicted of gross sexual imposition and corruption of a minor. Waites served approximately two years in prison and was released in 1987; thereafter, he returned to his Lake County residence in Perry, Ohio.

In 1988 or 1989, Waites again became involved in 4–H activities in Lake County. The testimony at trial indicated that individuals in Lake County at that time were familiar with Waites and knew of his prior convictions. Among these individuals were Lake County 4–H advisors Mary Ann Zoldak and Linda Hofer, both of whom believed Waites was innocent.

Waites continued his involvement in Lake County 4–H until 1990 when, in August of that year during the Lake County Fair, a dispute arose between Waites and other members of the 4–H organization. Specifically, Waites made accusations that 4–H advisor Linda Hofer and her husband were raising sick goats, resulting in the contamination of other goats. Waites attempted to have the Hofers' goats removed from the fair. Waites also made accusations regarding the manner in which the goat judging was conducted at the fair that year.

In 1989, Thomas Hopkins was hired by defendant as the Ashtabula County extension agent to oversee the 4–H program in that county. One of the 4–H clubs in Ashtabula County at that time was the "All–County Kids." Cynthia Maddox Cook and Chris Malnar were advisors to the All–County Kids in the early 1990s.

The Ashtabula County Fair Board, through a cooperative arrangement, delegates responsibility for organizing the junior fair show to the Ashtabula County 4–H. One of the components of the junior fair is the junior fair goat show. In the late 1980s and early 1990s, the 4–H small animal committee made recommendations regarding the selection of judges for the county fair. Catherine ("Kitty") Butler, a 4–H advisor, worked on the small animal committee during those years

and was the individual primarily responsible for selecting the goat judge at the fair during this time.

Butler was familiar with Waites, who had a reputation as a goat expert. They first met in 1983, at about the time Butler began raising goats as a business venture. Butler and Waites became friends through activities at goat shows and by working together on various goat-related projects. Butler invited Waites to be a judge at the Ashtabula County Fair in 1988 and 1989. Waites also was asked to speak at Ashtabula County 4–H sponsored prefair clinics in April 1991, May 1990, May 1989, and June 1988.

Waites received $25 for judging the goat show at the 1988 Ashtabula County Fair and $35 for judging the show at the 1989 Ashtabula County Fair. He received $15 for his work at the prefair clinic in 1989, and $20 for the clinic he conducted in 1990. Funding for judges at the fair is provided by the fair board.

In March 1990, Hopkins received a memo from Jodi Black, an employee of the Ohio State University ("OSU") extension office, indicating that Waites had served two years in prison for gross sexual imposition and corruption of a minor. Black, a 4–H animal science extension associate, was prompted to write the letter by a phone call she had received in early 1990 from a woman who had been a judge at the Ross County goat show. The caller told Black that " 'James Waites is on your nonrecommended, nonapproved, noncertified judges list, and I believe he is a convicted child molester. I'm not for sure, but I've heard that.' " As a result of that conversation, Black contacted Dr. John Stitzlein, the head of personnel for the OSU extension service, as well as James Helt, the state 4–H leader. Stitzlein and Helt recommended that Black send out a letter to county agents to inform the county extension personnel responsible for selecting junior fair judges of the facts concerning Waites. Black sent the letter to all eighty-eight Ohio counties.

Shortly thereafter, at an April meeting of the Ashtabula County 4–H small animal committee, Hopkins raised the issue of the Black memo. During that meeting, Kitty Butler stood up and spoke on behalf of Waites, stating that she had known Waites for a long time, that she was aware of his prior criminal record, and that she did not believe that he was guilty. Hopkins testified that several people then spoke up and indicated that, since Kitty Butler was familiar with the situation, having known Waites for a period of time, and based upon the fact that this was a "one-time situation, * * * we were only asking him to come and do a clinic, in a public setting, where he would be under our control, and then he would be back across the county lines, that it was a reasonable thing to * * * go ahead and ask him to come and allow him to do that clinic." Thus, following the meeting at which the memo was discussed, Waites spoke at a clinic in the spring of 1990 and he was a speaker at another clinic in the spring of 1991. Both of these clinics were open to the public. None of the advisors of the All–County

Kids attended the April 1990 meeting, and the evidence indicated that neither of those advisors, nor any other advisors in Ashtabula County, were notified at the time of Waites's prior criminal record.

Stephanie Foucher joined 4–H in November 1991, and was a member until September 1992. Soon after joining 4–H, she became involved in a goat project. Stephanie asked Chris Malnar if she knew someone who could assist her with goats and Malnar suggested Waites. Stephanie and her stepfather subsequently went with Waites to Chesterland, Ohio to purchase a goat for Stephanie's project.

Stephanie recalled seeing Waites at the home of Chris Malnar during a meeting of the All–County Kids club in January 1992. Specifically, Stephanie testified as follows:

"Q. What was he [Waites] doing there at the meeting?

"A. Um, he was out back. All of us were in her house, and I think he was out back with her husband, and then he came in later and just stood around and watched us and butted in whatever he wanted to say.

"Q. When you say 'butted in,' was he talking—

"A. Well, he just put his two cents in.

"Q. And the subject, I take it, was goats?

"A. Yes."

Stephanie also indicated that she saw Waites at a club meeting at the home of Cynthia Cook. Stephanie stated that Waites once drove her home from an activity at a farm where other members of the club were in attendance. Stephanie did not recall seeing Waites at any club meetings held at the fairgrounds. Waites and Cook once came over to Stephanie's house to help dehorn Stephanie's goat. Waites came over to Stephanie's house on two occasions by himself to assist with Stephanie's goat. Stephanie indicated that she did not ask him to come to her house; rather, she stated, "usually he invited himself over." Waites made phone calls to Stephanie at her home and Stephanie recalled phoning Waites two or three times regarding questions about her goat.

Stephanie's mother, Carol Evans, testified that in the spring of 1992, Waites would come over to the house "every so often" to talk with Stephanie about the goat. More specifically, Evans recalled that he came to the house on six occasions. According to Evans, it was her impression that Waites was spoken about and treated as though he were a 4–H leader. Evans stated that Waites "was allowed to be very involved with these children * * * and I assumed he was a leader." Evans sometimes drove her daughter to club meetings; on those occasions, she never saw Waites at any meetings.

Waites told Evans that he was an orthopedic doctor and that he worked at Mount Sinai Hospital; Evans thought that Waites sounded very credible. During the month of May 1992, Waites began making frequent telephone calls to the Evans's residence to talk with Stephanie. Waites told Evans that "he thought Steph had potential and that she could do real well and that he wanted to work with her, and I just believed him." Waites spoke about a possible 4–H scholarship for college.

Waites subsequently offered to give Stephanie a French Alpine goat. On Sunday morning, May 30, 1992, Waites picked up Stephanie at the home of Cynthia Cook, where Stephanie had spent the previous evening attending an all-night sleep-over with other girls. Stephanie had her mother's permission to go with Waites to pick up the goat that day. Stephanie was molested by Waites at his residence on that date, under the pretext that he was going to give her a physical examination. Stephanie did not tell her mother of the assault when it occurred.

At the time of the molestation, Stephanie believed that Waites was a physician. Specifically, Waites told her that he was a bone doctor and that he worked at Mt. Sinai in Cleveland, Ohio. Waites often carried a black medical bag and he told Stephanie that entertainer Michael Jackson was one of his patients. Stephanie testified that Waites was not an advisor to the All–County Kids but she believed he was part of 4–H. Waites molested other children, including Kitty Butler's daughter, under the pretext, in most instances, that he was a physician.

Waites was subsequently indicted in Lake County on various counts of kidnapping, corruption of a minor, rape and felonious sexual assault involving four minors, including Stephanie. Following a jury trial, Waites was convicted on all counts.[1]

In the instant case, part of plaintiffs' theory of the case was that Waites, in addition to performing duties as a fair judge and clinic speaker, also served on behalf of 4–H as a volunteer project advisor, and that he was actively involved at the local club level. Defendant, on the other hand, claimed that Waites was never an advisor in Ashtabula County and that he merely acted out of his own interest, without the knowledge of the Ashtabula County extension office, to become personally involved in the Ashtabula County goat community and gain the trust of parents and children. There was varying testimony regarding Waites's degree of involvement within the Ashtabula 4–H organization at the local club level.

---

1. On appeal, the Court of Appeals for Lake County affirmed in part and reversed in part the judgment of the trial court. See *State v. Waites* (Aug. 19, 1994), Lake App. No. 93–L–009, unreported, 1994 WL 590289.

Sandra Koch, a mother of one of the members of the All–County Kids, testified that she had first met Waites in 1989 and that she saw Waites at five or six club meetings over a three-year period. She thought that he may have attended three or four meetings in 1990. Koch could not recall if he attended meetings in 1991. She stated that Waites participated in carpools. She also indicated that Waites would visit their house, either in the company of Chris Malnar, Cynthia Cook, or by himself, regarding goat matters.

Sandra Koch's daughter, Terra, who was a member of the All–County Kids and was one of Waites's victims, testified that Waites attended nine or ten club meetings in 1990. Terra stated that Waites drove her home from 4–H meetings. Terra stated that in 1991, Waites attended eight or nine meetings and that Waites's attendance at the club declined in 1992 when he only attended a couple of meetings early in the year. Terra testified that, after Waites no longer was a judge at fairs, he continued to attend the fairs in 1991 and 1992. According to Terra, Waites "would basically hang around the goat barn * * * [a]nd he just helped everybody out." Terra stated that Waites was never an advisor to her club.

Cynthia Cook, a 4–H advisor in Ashtabula County during 1991 and 1992 for the All–County Kids, testified that she could not recall if Waites had ever been to a meeting of the club. Cook stated that Waites did transport children to and from goat activities in his vehicle, and Cook had gone with Waites to the homes of children to help assist with the care of their goats. Waites would also go to the county fair and help children prepare animals for the show. Cook stated that Waites was never an advisor with the All–County Kids club.

Ashtabula County extension agent Thomas Hopkins testified that James Waites was never a 4–H advisor in Ashtabula County. Hopkins had no knowledge that Waites attended any club meetings or had any involvement with 4–H clubs in Ashtabula County in 1990 and 1991 apart from conducting two prefair clinics. Hopkins testified that, under the 4–H organizational structure, local club advisors have a great deal of discretion regarding club activities. He further stated that it would be up to a club advisor to inform the county extension office about somebody who wanted to be an advisor at a club level.

Kitty Butler, a member of the 4–H small animal committee, testified that she was not aware that Waites had attended any meetings of the All–County Kids club nor did she have any knowledge that he was involved in carpools with the club. Butler had no knowledge that Waites was a 4–H advisor in Ashtabula County.

Defendant also introduced into evidence the deposition testimony of Chris Malnar. Malnar, who served as an advisor with the All–County Kids, stated that Waites was never at a meeting.

On June 30, 1995, the Court of Claims rendered its decision, finding in favor of defendant. In its decision, the court held that:

"The child molesting activities of Waites in this case were the direct and proximate result of Waites securing the confidence and trust of Stephanie and her parents. The county extension agent had no reason to anticipate or believe that Waites would develop such personal relationships, and he was never aware of any such activities;

"Hopkins had neither the power nor the duty to control Waites' personal activities. * * *

" * * *

"The criminal acts that Waites committed against Stephanie did not occur at a 4-H event, function or activity and did not occur on property owned or under the control of 4-H. Waites was only paid to judge goats and do pre-fair clinics in Ashtabula County. He properly performed those responsibilities. 4-H is not responsible for the personal actions of Waites or of the actions of the thousands of young people who participate in volunteer 4-H activities when they are not attending a 4-H function. * * * In this case, plaintiffs have failed to prove by a preponderance of the evidence that the defendant was negligent and such negligence was a proximate cause of the assault on Stephanie. It was not reasonable or foreseeable that a person hired to be a judge from a foreign county would then become personally involved with children and their families who attended the fair and clinics. * * * "

On appeal, plaintiffs set forth the following eight assignments of error for review:

"Assignment of Error No. 1

"The court erred in holding that the decision of Thomas Hopkins not to inform the club advisors and members of the 4-H small animal committee of James Waites' history of child molesting is entitled to statutory immunity.

"Assignment of Error No. 2

"The court erred in not holding that the state of Ohio was liable for the negligent hiring of James Waites.

"Assignment of Error No. 3

"The court erred in holding that it was not reasonably foreseeable that an individual such as James Waites would sexually molest young girls involved in 4-H.

"Assignment of Error No. 4

"The court erred in holding that the Ohio State University could not be held liable as the criminal conduct of James Waites was an intervening event.

"Assignment of Error No. 5

"The court erred in holding that the conduct of 4–H employees Owen, Maruschak and Hopkins, were not guilty [sic] of wanton misconduct relative to the retention of James Waites and the failure to warn others relative to their actual knowledge of Waites criminal history.

"Assignment of Error No. 6

"The court erred and [sic] finding that there was no evidence that Waites ever committed any criminal acts at any 4–H clinic, fair or club meetings.

"Assignment of Error No. 7

"The court erred in holding that 4–H was not a person in loco parentis based upon *State v. Noggle.*

"Assignment of Error No. 8

"The court erred when it did not find that the plaintiffs-appellants must prevail upon the theory of agency by estoppel or apparent agency."

While the issue of duty will be discussed more fully below, we will initially address plaintiffs' assertion, raised under the seventh assignment of error, that the Court of Claims erred in not finding that an *in loco parentis* relationship existed between Stephanie and the 4–H organization which imposed a duty on 4–H, arising from that relationship, to protect Stephanie from the sexual attack of Waites. Plaintiffs argue that the Court of Claims improperly relied upon *State v. Noggle* (1993), 67 Ohio St.3d 31, 615 N.E.2d 1040, in finding that an *in loco parentis* relationship did not exist.

The term *"in loco parentis"* has been defined as "the relationship which a person assumes toward a child not his own, holding him out to the world as a member of his family toward whom he owes the discharge of parental duties"; further, "a person standing in loco parentis to a child is one who had put himself in the situation of a lawful parent assuming the obligations incident to the parental relation, without going through the formalities necessary to a legal adoption." *In re Estate of George* (App.1959), 82 Ohio Law Abs. 452, 455. This court has previously held that "[w]hen a person accepts custody of a child, that person stands *in loco parentis* to the child, accepting all the rights and responsibilities that go with that status." *Slagle v. White Castle Systems, Inc.* (1992), 79 Ohio App.3d 210, 217, 607 N.E.2d 45, 49. The key factors of an *in loco parentis* relationship have been delineated as "the intentional assumption of obligations incidental to the parental relationship, especially support and maintenance." *Nova Univ., Inc. v. Wagner* (Fla.1986), 491 So.2d 1116, 1118, fn. 2.

In *Noggle, supra,* the Ohio Supreme Court had the occasion to discuss the phrase *"in loco parentis"* in the context of its relationship to R.C. 2907.03(A)(5), Ohio's sexual battery statute. The defendant in *Noggle,* a high school teacher and coach, was charged under the statute with alleged sexual conduct involving a student. An amended bill of particulars filed by the prosecution alleged that an *in loco parentis* relationship existed between defendant and the student by virtue of defendant's position as a teacher and school coach. The trial court dismissed the indictment, holding that a teacher and coach is not, as a matter of law, a person *in loco parentis* for purposes of the criminal statute. On appeal, the court of appeals upheld the trial court's decision.

On further appeal, the Ohio Supreme Court affirmed the decision of the court of appeals, relying in part upon the following definition of *in loco parentis:*

"'The term 'in loco parentis' means 'charged, factitiously, with a parent's rights, duties, and responsibilities.' Black's Law Dictionary (6 Ed.1990) 787. A person in loco parentis has assumed the same duties as a guardian or custodian, only not through a legal proceeding." *Noggle,* 67 Ohio St.3d at 33, 615 N.E.2d at 1042.

The court went on to hold that the criminal statute at issue "was not designed for teachers, coaches, scout leaders, or any other persons who might temporarily have some disciplinary control over a child. Simply put, the statute applies to the people the child goes home to." *Id.* The court further rejected a contention by the state that there may be certain scenarios where a teacher might be considered as a person *in loco parentis,* holding that "[t]he only time a teacher could be found to be so would be if the student lived with the teacher and relied on the teacher for support." *Id.* at 34, 615 N.E.2d at 1042.

■ Thus, under the case law, the relationship of *in loco parentis* is established when a person assumes the responsibilities incident to parental status, including custody and support of the child; stated otherwise, the rights, duties and responsibilities are the same as those of the lawful parent. Based upon case authority, and a review of the evidence regarding the nature of the 4–H organization, we are unable to accept plaintiffs' contention that 4–H assumes the type of parental rights, duties or responsibilities over its members, including matters of custody, support and maintenance, that the term *in loco parentis* contemplates, and we hold that the Court of Claims did not err in failing to find that defendant stood in the relation of *in loco parentis* with the injured plaintiff.

Plaintiffs' seventh assignment of error is overruled.

Plaintiffs' second, third, fourth, sixth and eighth assignments of error are interrelated and will be jointly considered next.

Under the second and eighth assignments of error, plaintiffs contend that the Court of Claims erred in failing to address the theories of negligent hiring or

negligent retention and in failing to find that an apparent agency relationship existed between 4–H, Waites and the children and parents of the Ashtabula County 4–H organization. Under the third and fourth assignments of error, plaintiffs argue that the court erred in holding that it was not reasonably foreseeable that Waites would engage in sexual activity with 4–H members he came in contact with. Plaintiffs assert under the sixth assignment of error that the Court of Claims made certain erroneous findings regarding whether Waites ever engaged in criminal acts at a 4–H activity.

It is fundamental that the elements necessary to establish actionable negligence consist of the existence of a duty, a breach of that duty and an injury proximately resulting therefrom. *Menifee v. Ohio Welding Products, Inc.* (1984), 15 Ohio St.3d 75, 77, 15 OBR 179, 180–181, 472 N.E.2d 707, 710. In the instant case, it was not disputed that the Ashtabula County extension office had knowledge of Waites's prior criminal record by virtue of the memo prepared and circulated in March 1990 to all county extension offices by Jodi Black, an employee in the OSU extension office. While the decision of the Court of Claims discusses the import of defendant's knowledge of Waites's criminal record in the context of both duty and proximate cause in its determination that there was no liability on the part of defendant, the threshold (and in this particular case, determinative) inquiry goes to the question of duty.

One commentator has observed that:

"Once it is established that the defendant's conduct has in fact been one of the causes of the plaintiff's injury, there remains the question of whether the defendant should be legally responsible for the injury. Unlike the fact of causation, with which it is often hopelessly confused, this is primarily a problem of law. It is sometimes said to depend on whether the conduct has been so significant and important a cause that the defendant should be legally responsible. But both significance and importance turn upon conclusions in terms of legal policy, so that they depend essentially on whether the policy of the law will extend the responsibility for the conduct to the consequences which have in fact occurred. Quite often this has been stated, and properly so, as an issue of whether the defendant is under any duty to the plaintiff, or whether the duty includes protection against such consequences. This is not a question of causation, or even a question of fact, but quite far removed from both; and the attempt to deal with it in such terms has led and can lead only to utter confusion." Prosser & Keeton, Law of Torts (5 Ed.1984) 272–273, Section 42.

In considering the issue of intervening intentional or criminal acts in cases where "the defendant has created the situation acted upon by another force to bring about the result," the above commentator has noted that an attempt to deal with such cases in terms of proximate cause "is only to avoid the real issue;"

rather, the problem is best stated as "the scope of the legal obligation to protect the plaintiff against such an intervening cause." *Id.* at 313, Section 44.

■ The existence of a duty in a negligence case is a question of law for a court to determine and there is no formula for ascertaining whether such a duty arises. *Mussivand v. David* (1989), 45 Ohio St.3d 314, 318, 544 N.E.2d 265, 269–270. Rather, it has been stated that duty " 'is the court's "expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." ' " *Id.,* quoting Prosser, Law of Torts (4 Ed.1971) 325–326.

We will first address plaintiffs' contention that the Court of Claims failed to address the theories of negligent hiring or negligent retention in its findings of fact even though, it is asserted, those theories were properly pled and proven at trial. The tort of negligent hiring is recognized in Ohio. See *Byrd v. Faber* (1991), 57 Ohio St.3d 56, 565 N.E.2d 584. The tort is set forth in the Restatement of the Law 2d, Agency (1958), Section 213, which provides:

"A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless:

" * * *

"(b) in the employment of improper persons or instrumentalities in work involving risk of harm to others * * *."

■ The elements necessary for a plaintiff to prove an action for negligent hiring or retention are:

" ' * * * (1) the existence of an employment relationship; (2) the employee's incompetence; (3) the employer's actual or constructive knowledge of such incompetence; (4) the employee's act or omission causing the plaintiff's injuries; and (5) the employer's negligence in hiring or retaining the employee as the proximate cause of plaintiff's injuries.' " *Ruta v. Breckenridge–Remy Co.* (Dec. 12, 1980), Erie App. No. E–80–39, unreported.

Initially, we note that, while plaintiffs contend that the Court of Claims failed to consider both negligent hiring and negligent retention as theories of recovery, plaintiffs' negligent retention claim appears to be based upon the assertion that, subsequent to the time the Ashtabula County extension office last hired Waites to participate in a clinic in the spring of 1991, the extension office negligently retained Waites's services as a "project advisor volunteer" and allowed him to serve as a chaperone and carpool driver for a local 4–H club in Ashtabula County. There was no evidence presented at trial, however, indicating that any official in the Ashtabula County extension office had knowledge that Waites attended or participated in any local club meetings after he spoke at the last clinic for which

he was compensated in May 1991. Thus, under the facts developed at trial, plaintiffs' claim appears to be more properly based upon a theory of negligent hiring as opposed to negligent retention or supervision of an employee.

■ We further note that, in addition to plaintiffs' contention that a duty of care was breached by defendant under a negligent hiring theory, plaintiffs also assert that a duty was owed to protect against the criminal acts of a third person based upon the existence of a special relationship. Whether considering a claim based upon negligent hiring or one for failure to control the conduct of a third person (and even assuming, *arguendo*, the existence of a special relationship), the issue of whether a duty is owed is based upon the foreseeability of the injury.

■ In *Fed. Steel & Wire Corp. v. Ruhlin Constr. Co.* (1989), 45 Ohio St.3d 171, 173–174, 543 N.E.2d 769, 772–773, the court held that:

" * * * Ordinarily, there is no duty to control the conduct of a third person by preventing him or her from causing harm to another, except in cases where there exists a special relationship between the actor and the third person which gives rise to a duty to control, or between the actor and another which gives the other the right to protection. * * * Thus, liability in negligence will not lie in the absence of a special duty owed by a particular defendant. * * *

"We have found that '[t]he existence of a duty depends on the foreseeability of the injury. * * * ' * * * The court in *Menifee, supra*, set forth the following test to be used in order to determine foreseeability: '[W]hether a reasonably prudent person would have anticipated that an injury was likely to result from the performance or nonperformance of an act.' * * * We recognize that there is no common-law duty to anticipate or foresee criminal activity. * * * Thus, the law usually does not require the prudent person to expect the criminal activity of others. As a result, the duty to protect against injury caused by third parties, which may be imposed where a special relationship exists, is expressed as an exception to the general rule of no liability. * * * "

■ Concerning criminal acts of a third party which the defendant might reasonably anticipate, "the mere fact that misconduct on the part of another might be foreseen is not of itself sufficient to place the responsibility upon the defendant." Prosser & Keeton, *supra*, at 305. Rather, "[i]t is only where misconduct was to be anticipated, and taking the risk of it was unreasonable, that liability will be imposed for consequences to which such intervening acts contributed." *Id.* at 313.

■ The issue before this court, therefore, is whether defendant, through its county extension office, owed a duty of care extending to Stephanie in its decision to hire Waites as a fair judge or clinic speaker on the basis that such employment

might create a reasonably foreseeable risk of harm. More specifically, the issue is whether defendant, knowing of Waites's prior criminal record, should have reasonably foreseen the likelihood that, as a result of Waites's employment as a clinic speaker, he would later become personally involved within the Ashtabula County 4–H community, come in contact with Stephanie (not herself a member of 4–H during Waites's employment), and engage in wrongful misconduct.

Plaintiffs focus primarily upon the fact that defendant was made aware of Waites's prior criminal record, such knowledge presumably giving rise to a duty (either to warn others or to control a third person) extending to all 4–H members Waites came in contact with subsequent to his employment as a clinic speaker. Assuming that defendant's knowledge of Waites's prior criminal record, in and of itself, defined the scope of the duty, the requisite inquiry would end. The scope of the duty, however, is "limited to cover only those intervening causes which lie within the scope of the foreseeable risk, or have at least some reasonable connection with it * * *." Prosser & Keeton, *supra*, at 312.

Under the facts of this case, we find that the attack on Stephanie was not a reasonably foreseeable consequence of defendant's decision to engage Waites as a goat judge or clinic speaker. The record indicates that Waites was hired by Ashtabula County 4–H to conduct four separate clinics and to judge two county fair shows. The two fair events (in 1988 and 1989) as well as two of the clinics (in 1988 and 1989) took place before the Black memo was circulated. After learning of Waites's prior record, the county extension office, through the small animal committee, met and discussed the memo. Thereafter, a decision was made to allow Waites to speak at a clinic in 1990 and a subsequent clinic in 1991 based upon the view that the nature of his employment, including the fact that Waites would have limited contact with 4–H members, would not result in any harm. The duties Waites was hired to perform required him to speak at clinics in a controlled setting under the supervision of the county extension office. The clinics were open to the public and there was no evidence that any incidents occurred at the clinics (or fairs) in which he was asked to participate. The injured plaintiff was not a member of Ashtabula County 4–H at any time during which Waites judged a fair show or conducted a clinic; she became a 4–H member approximately six months after Waites last spoke at a clinic and the molestation took place, not at a 4–H activity, but at Waites's residence, over one year after the employment relationship between 4–H and Waites had ended.

The Court of Claims found that Waites had never applied to be an adult volunteer advisor in Ashtabula County and there was evidence supporting a

finding that he was not recognized as an advisor there.[2] County extension agent Thomas Hopkins testified that local club advisors are responsible for informing the county extension office of any individuals who wish to participate at the local level in an official capacity. Club advisors Malnar and Cook both stated that Waites never served as an advisor for their club. While there was evidence indicating that Waites may have shown up on his own volition at 4–H club meetings (as well as other goat-related activities) and that he made himself available to provide transportation, the evidence supports the Court of Claims' finding that the county extension office had no knowledge that Waites was involved in local 4–H club meetings. The evidence indicated that Waites gained the trust and friendship of parents and members of the 4–H community in Ashtabula County; he was adept at developing personal relationships and he convinced these individuals that he was a physician and that he could be influential in obtaining "scholarships" for the children. The evidence further indicated that Waites would appear unannounced at the home of Stephanie and that he pursued a continuing relationship with the family through numerous telephone calls to Stephanie's home.

As found by the Court of Claims, the molestation of Stephanie by Waites was a self-serving act, unrelated to Waites's employment as a 4–H goat judge or clinic speaker. On the date of the incident, Waites made arrangements with Stephanie's mother to pick up Stephanie and drive her to his home. As noted above, the molestation occurred at Waites's home, over a year after he was last hired to conduct a clinic in Ashtabula County, and the events giving rise to the incident occurred without the sanction, knowledge or control of the county 4–H extension office.

The foreseeability of a criminal act depends on the knowledge of the defendant, which must be determined by the totality of the circumstances, and it is only when the totality of the circumstances are "somewhat overwhelming" that the defendant will be held liable. *Feichtner v. Cleveland* (1994), 95 Ohio App.3d 388, 396, 642 N.E.2d 657, 662. In considering the totality of the circumstances, we are unable to conclude that the probability of harm to the plaintiff should have been reasonably anticipated by defendant at the time Waites was engaged to be a clinic speaker. As previously noted, the duties for which Waites was hired involved limited contact with those in attendance and took place in a controlled

---

**2.** Plaintiffs assert that Waites was a "volunteer project advisor," a title appearing in an "Ohio 4–H BLAST Program" manual. However, Ashtabula County extension agent Thomas Hopkins testified that the "BLAST Program" curriculum was not in place prior to the fall of 1992. Hopkins further testified that, during the time of Waites's alleged involvement in local 4–H club activities, there was nobody who served solely in the capacity of what might be considered a volunteer project advisor in Ashtabula County.

setting under the supervision of the county extension office. The scope of an employer's duty in exercising reasonable care in making a hiring decision "is largely dependent on the type of responsibilities associated with the particular job." *Yunker v. Honeywell, Inc.* (Minn.App.1993), 496 N.W.2d 419, 422. See, also, *Connes v. Molalla Transport System, Inc.* (Colo.1992), 831 P.2d 1316, 1321 (scope of duty "will depend largely on the anticipated degree of contact which the employee will have with other persons in performing his or her employment duties"). In addition to the limited nature of the duties for which Waites was hired as well as the limited degree of contact he had with other individuals in performing those duties, the circumstances of this case indicate that no incidents occurred at any clinic in which Waites participated, Waites was never a 4–H advisor in Ashtabula County, defendant had no knowledge of Waites's personal activities in that county, the assault at issue did not occur at a 4–H event, the injured plaintiff was not a member of 4–H at the time Waites was employed by defendant, and there was no employment relationship between defendant and Waites at the time of the molestation, Waites's last clinic event taking place over one year prior to the incident. While a duty of care was owed by defendant to children attending the fair and clinic events for which Waites was hired, and may have encompassed members whom the county extension office had knowledge that Waites was involved with through 4–H club meetings or activities (a factual scenario not at issue in this case), we are unable to conclude that a duty of care extended to every member of 4–H who Waites may have come in contact with following his fair and clinic employment; more particularly, under the circumstances of this case, defendant's duty of care did not extend to the risk of foreseeing the misconduct that occurred.

Accordingly, the Court of Claims did not err in failing to find defendant liable under a negligent hiring theory, nor did the court err in finding that the harm was not a reasonably foreseeable consequence of defendant's conduct.

We note that, under the fourth assignment of error, plaintiffs discuss the issue of foreseeability as an element of proximate cause, relying in part upon Sections 448 and 449 of the Restatement of Law 2d, Torts (1965). Having found, however, that the injured party was not a foreseeable plaintiff under a duty analysis, we need not reach the issue of proximate cause. See, *e.g., Giant Food, Inc. v. Mitchell* (1994), 334 Md. 633, 641–642, 640 A.2d 1134, 1138 (Section 448 of the Restatement concerns itself with whether the criminal act of a third person is a superseding cause of the actor's negligence; for purposes of Section 448, the actor's negligence is a given); *Casey v. Geiger* (1985), 346 Pa.Super. 279, 293, 499 A.2d 606, 614 (Section 448 of the Restatement "is only relevant to the question of causation in a negligence action and does not determine whether appellees owed a duty of care to the appellant * * * ").

We note, however, to the extent that plaintiffs contend that the hiring of Waites placed 4–H's imprimatur or approval on his activities (*i.e.*, gave stature or credibility to Waites, thus allowing him to become actively involved in Ashtabula County), we find no error in the trial court's determination that plaintiffs failed to establish a causal connection between defendant's hiring decision and Waites's subsequent criminal actions. While plaintiffs argue that defendant "selected Waites as a Judge and clinic instructor thereby creating an aura of respectability" with the parents and children of Ashtabula County, plaintiffs make no distinction between Waites's activities prior to the disclosure to defendant of his convictions and his activities subsequent thereto; rather, plaintiffs discuss Waites's involvement with 4–H in the aggregate and assert a causal connection based upon such activity in general. The evidence, however, fails to link Waites's attendance at two clinics (following the disclosure of his convictions) with his ability to ingratiate himself within the Ashtabula 4–H community and assault the victim in this case; thus, the trial court did not err in finding that plaintiffs failed to prove by a preponderance of the evidence that defendant's actions proximately caused the plaintiff's injuries.

 We further find no merit to plaintiffs' contention that the trial court erred in failing to find defendant liable under a theory of agency by estoppel or apparent authority. An "agency relationship" is defined as "a consensual fiduciary relationship between two persons where the agent has the power to bind the principal by his actions, and the principal has the right to control the actions of the agent." *Funk v. Hancock* (1985), 26 Ohio App.3d 107, 110, 26 OBR 317, 320, 498 N.E.2d 490, 494, citing *Haluka v. Baker* (1941), 66 Ohio App. 308, 312, 20 O.O. 136, 138, 34 N.E.2d 68, 70. The doctrines of agency by estoppel and apparent authority are equivalent and are based upon the same elements. *Whitlow v. Good Samaritan Hosp.* (1987), 42 Ohio App.3d 74, 76, 536 N.E.2d 659, 661–662. In order to show such an agency, a plaintiff must establish:

"(1) That the principal held the agent out to the public as possessing sufficient authority to embrace the particular act in question, or knowingly permitted him to act as having such authority, and (2) that the person dealing with the agent knew of the facts and acting in good faith had reason to believe and did believe that the agent possessed the necessary authority." *Logsdon v. ABCO Constr. Co.* (1956), 103 Ohio App. 233, 241–242, 3 O.O.2d 289, 293, 141 N.E.2d 216, 223.

 In the context of an unpaid volunteer, courts have noted that the volunteer "may be a servant of one accepting such services." *Doe v. Roman Catholic Church* (La.App.1992), 602 So.2d 129, citing the Restatement 2d of Agency, Section 225. The determination of whether an unpaid volunteer is a servant "generally depends on the charitable organization's right to control the activities of the volunteer." *Id.*

■ Plaintiffs' claim of apparent agency is based upon the contention that the Ashtabula County 4–H knowingly permitted Waites to attend 4–H meetings, to teach at these meetings, to go on field trips with advisors and children, and to act with authority on behalf of the Ashtabula County 4–H. As previously noted, however, there was evidence presented, including the testimony of the Ashtabula County extension agent which, if believed, indicated that the county extension office was unaware of any alleged activity by Waites in connection with local 4–H clubs in Ashtabula County.

Plaintiffs assert that the evidence shows that the county extension agent "had full control over the volunteers" in 4–H at the local level. However, the testimony of Lake County extension agent William Owen and Ashtabula County extension agent Thomas Hopkins indicated that, under the 4–H organizational structure, local clubs possess a great deal of autonomy and advisors are vested with a high degree of discretion regarding club activities. William Owen, who stated that there are between two hundred and two hundred fifty local clubs in Lake County, provided the following testimony during direct examination regarding the amount of control exerted by the county extension office in club matters:

"Q. And who determines when and where these clubs will meet?

"A. That's up to the adviser and the club members.

"Q. And who determines what they are going to discuss at those meetings?

"A. That's also up to the adviser and the officers of the club.

"Q. Do these clubs report to you, as the county extension agent, in any form or fashion, about their activities?

"A. I'm not sure 'report' is the word I would use. Some keep us pretty well informed of what they are doing, and others are basically on their own, doing their own activities.

"We don't have a reporting system where they have to fill out a form, 'This is what the club did this month or this year.' From time to time we ask them for things like, 'What community service projects did you do?' But there's no official reporting mechanism, no.

"Q. And there's no requirement that they do that, then?

"A. Absolutely not."

Thomas Hopkins testified that clubs in Ashtabula County were operated in a similar manner. Hopkins stated that "I tell new advisers that one of our strengths is the freedom that they have in their club, to organize their club, to create their own meeting schedules, so we don't dictate many of those things." Hopkins added that "there is a lot of * * * independence that the advisers assume. They assume a lot of responsibility." Hopkins further stated that it

was up to the local advisors "to let us know * * * if they have somebody that they want to have help them in their club, in an official way."

The issue of apparent authority and its relationship to the degree of control an organization exercises over its local leaders was raised in *Wilson v. United States* (C.A.8, 1993), 989 F.2d 953. In that case, the plaintiffs, parents of boy scouts involved in an accident while visiting Fort Leonard Wood, Missouri, brought an action against the Boy Scouts of America ("BSA") for alleged negligence on the part of the adult leaders of a scout troop, raising claims that a principal-agency relationship existed between BSA and its local council under a theory of implied agency or apparent authority. On the particular activity giving rise to the negligence action, members of a local troop had gone on a boy scout trip at an army base, when, on the second night of their weekend stay, one of the youths was fatally electrocuted while playing with an aluminum pipe which came into contact with a high voltage power line.

The facts in *Wilson* indicated that, under the organizational structure of BSA, local volunteers formed a patrol leaders' council to plan troop activities, local troops did not need permission from BSA before participating in activities, and BSA had no advance notice of the troop's trip to Fort Leonard Wood. The court in *Wilson*, in rejecting plaintiffs' claim of apparent authority, held that:

"Appellants fail * * * to produce any evidence that BSA manifested that it had direct control over the specific activities of individual troops or that it had a duty to control, supervise or train volunteer leaders for the Fort Leonard Wood activity. On the contrary, the Boy Scout Handbook clearly provides, '[w]hat the troop does is planned by the patrol leaders' council.' The organizational structure of the BSA leaves the control of the specific activities at the level closest to the individual troop. Appellants have produced no direct or circumstantial evidence to suggest that in this case BSA manifested control." *Wilson, supra,* 989 F.2d at 959.

The court in *Wilson* noted that other jurisdictions had rejected liability on the part of BSA or local councils under similar circumstances, noting the lack of control these entities exercise over individual troops. See, *e.g., Mauch v. Kissling* (1989), 56 Wash.App. 312, 783 P.2d 601 (scoutmaster not acting as ostensible agent of scouting organization while flying private plane with scout as passenger where organization had no duty or right to control scoutmaster's actions as private pilot, nor did they have a duty to prevent scout from accompanying him where there was no evidence scoutmaster would be carrying a scout passenger); *Anderson v. Boy Scouts of Am., Inc.* (1992), 226 Ill.App.3d 440, 168 Ill.Dec. 492, 589 N.E.2d 892 (local scout leader not agent of BSA at time he negligently ran over infant while backing out of driveway after delivering craft materials to be used for scouting project; there were no provisions in BSA

charter, bylaws, rules or regulations which grant BSA or its district councils' direct supervisory powers over the method or manner in which adult volunteer scout leaders accomplish their tasks, and there was no evidence BSA exercised any control over scout leader on the date in question); *Wilson v. St. Louis Area Council* (Mo.App.1992), 845 S.W.2d 568 (mere assertion by plaintiff that BSA and Council constituted one organization, with scout leaders as its representatives, not sufficient to create apparent authority in absence of evidence of representations by Council which would give rise to such reliance; further, plaintiff presented no evidence that scouting organizations consented to or had control over scoutmaster's activities).

In the instant case, apart from the occasions in which the county extension office hired Waites to judge two fair goat shows and to conduct four prefair clinics, the evidence does not indicate that the extension office had the right to control, nor that it manifested a right to control or supervise, Waites's actions. Waites was not a 4–H advisor and, while he may have attempted to clothe himself with authority from the 4–H organization, his self-serving pursuits were not in service to Ashtabula County 4–H. In an action alleging apparent authority, "a principal is responsible for the acts of an agent within his apparent authority only where the principal himself by his acts or conduct clothes the agent with the appearance of the authority, and not where the agent's own conduct creates the apparent authority." *Logsdon,* 103 Ohio App. 233, 3 O.O.2d 289, 141 N.E.2d 216, at paragraph one of the syllabus.

The facts surrounding the injury to the plaintiff in the instant case are even more attenuated than those in *Wilson,* 989 F.2d 953, whereas the fatality in *Wilson* occurred on a troop outing under the supervision of scout leaders, the assault in the instant case was not connected with a 4–H sponsored activity and did not involve 4–H personnel. As previously noted, the evidence regarding the events leading to the molestation of Stephanie indicates that Waites made arrangements with Stephanie's mother to pick Stephanie up and drive her to his house, the alleged purpose of the trip being Waites's offer to provide Stephanie with an Alpine goat. The Ashtabula County extension office did not direct, nor did they have knowledge of, this activity, and the Court of Claims did not err in failing to find defendant liable under a theory of apparent authority.

Finally, we address plaintiffs' argument under the sixth assignment of error, that the Court of Claims erred in finding that there was no evidence that James Waites ever committed any criminal acts at any 4–H clinics, fair events or club meetings. Plaintiffs maintain that there is evidence that Waites, on at least three occasions, committed gross sexual imposition with a minor "at 4–H sponsored events." Upon review, we find that the record does not support plaintiffs' contentions.

Plaintiffs first assert that the testimony of Kitty Butler indicates that Waites raped her sixteen-year-old daughter "at the 4–H Geauga County Fair in 1991." However, the record indicates that, while Kitty Butler testified that her daughter informed her that she was raped by Waites in September 1991, at the Burton Fair, there was no evidence indicating that her daughter was at the fair as a 4–H member or that Waites was at the fair as a representative of 4–H. Specifically, Butler testified that her daughter "was not involved with the goats" at the Burton Fair and she further indicated that Waites was not a judge; rather, Butler stated, "[h]e was a contestant, just like everybody else was."

Plaintiffs further argue that there was evidence that Waites assaulted Butler's daughter that summer "when he took her to a medical examination required for the youngster to obtain a 4–H college scholarship." Butler testified that her daughter told her that Waites was "supposed to have taken her for a doctor's appointment at a clinic—I don't even know for sure where it was—that he took her to his house and examined her and, I believe, raped her there." While plaintiffs maintain that this event was done under the ruse that the examination was for a "4–H college scholarship," Butler testified that "it had nothing to do with 4–H." Rather, Butler testified that Waites had told Butler and her daughter that "there was a program through his work where she could go to college while she was still in high school and take college courses," and that "in order to be enrolled in the program, she had to have a medical exam, so he arranged for the medical exam and took her."

The final incident pointed to by plaintiffs concerns evidence that Waites molested Terra Koch "while going to" a 4–H meeting. The evidence regarding this event indicates that the incident occurred at Waites's home and did not, by plaintiffs' own admission, occur at a 4–H activity. Further, there was no evidence that the county extension office had knowledge of this activity and the evidence simply does not support a finding that Waites was acting as an agent on behalf of defendant in offering transportation to Terra Koch. Upon review, the Court of Claims did not err in finding that no criminal acts were committed at a 4–H event.

Based upon the foregoing, plaintiffs' second, third, fourth, sixth and eighth assignments of error are overruled.

We will address plaintiffs' first and fifth assignments of error together. Under the first assignment of error, plaintiffs contend that the Court of Claims erred in holding that defendant's decision not to disseminate information regarding Waites's prior criminal record was entitled to statutory immunity under R.C.

2743.02.[3] Under the fifth assignment of error, plaintiffs contend that the Court of Claims erred in failing to find that certain 4-H employees engaged in wanton misconduct. More specifically, plaintiffs argue that William Owen, Donna Maruschak and Thomas Hopkins all engaged in wanton misconduct in failing to warn others of Waites's prior criminal record.

Even assuming that the Court of Claims erred in finding that OSU was entitled to statutory immunity on the grounds that the decision not to disseminate information about Waites's criminal record constituted a basic policy decision involving a high degree of discretion, in light of our disposition of the previous assignments of error, finding that a duty did not extend to the injured plaintiff under the theories advanced, any alleged error is non-prejudicial and this assignment of error is overruled as moot.

Nor does the evidence support a finding that individual 4-H employees Owen, Maruschak and Hopkins engaged in wanton misconduct. "Wanton" misconduct is defined as "a failure to use any care and an indifference to the consequences, when the probability of harm is great and the probability of harm is known or should be known." *Downing v. Columbus Bd. of Edn.* (Feb. 13, 1992), Franklin App. No. 91AP-981, unreported, 1992 WL 30802. In order to constitute wanton misconduct, the conduct of a tortfeasor "must be more than negligent: it must be such conduct with knowledge of a dangerous situation liable to cause injury to others, as manifests a heedless disregard for or indifference to the rights of others or for the consequences, *i.e.*, such conduct as manifests a disposition to perversity." *Roszman v. Sammett* (1971), 26 Ohio St.2d 94, 55 O.O.2d 165, 269 N.E.2d 420, paragraph two of the syllabus.

Defendant argues that the knowledge and conduct of Owen and Maruschak, both employees in Lake County, were irrelevant to the issue of liability in this case inasmuch as they never served in Ashtabula County and, in any event, the information regarding Waites's criminal record came to the attention of Ashtabula County officials in 1990, prior to the time Stephanie joined 4-H. We agree.

Regarding the actions of Ashtabula County extension officer Thomas Hopkins, the evidence fails to support plaintiffs' contention that he acted in a

---

**3.** In its decision, the Court of Claims relied upon *Reynolds v. State* (1984), 14 Ohio St.3d 68, 70, 14 OBR 506, 507–508, 471 N.E.2d 776, 778–779, in which the Ohio Supreme Court held that language in R.C. 2743.02 providing that the state shall have its liability determined in accordance with the same rules of law applicable to suits between private parties means that "the state cannot be sued for its legislative or judicial functions or the exercise of an executive or planning function involving the making of a basic policy decision which is characterized by the exercise of a high degree of official judgment or discretion."

wanton manner when, once he became aware of Waites's criminal record, he failed to disclose that information to 4–H advisors or members. As previously noted, after the Black memo was sent out, Hopkins brought up the issue at the small animal committee meeting and sought the advice of those members. At the meeting, Kitty Butler gave her opinion that Waites had not been guilty of the charges and other members of the committee were asked for their input on the matter. Hopkins testified that his decisionmaking process in this matter was based upon the views expressed at the meeting and the fact that Waites's duties in speaking at a clinic would be limited and under the control of the county extension office. Upon review, the record indicates that the Court of Claims did not err in failing to find that Hopkins's actions in dealing with the issue of the Black memo constituted wanton misconduct.

Plaintiffs' first and fifth assignments of error are without merit and are overruled.

Based upon the foregoing, plaintiffs' first, second, third, fourth, fifth, sixth, seventh and eighth assignments of error are overruled and the judgment of the Court of Claims is hereby affirmed.

*Judgment affirmed.*

PEGGY BRYANT, J., concurs.

LAZARUS, J., concurs in part and dissents in part.

LAZARUS, Judge, concurring in part and dissenting in part.

Although I concur with the majority's judgment regarding the fifth assignment of error, I dissent with regard to the majority's judgment that Ohio State University ("OSU") was not negligent. Because OSU was negligent, because that negligence was a proximate cause of Stephanie Foucher's injury, and because OSU was not immune, I would hold OSU liable.

OSU is liable based on two breaches of duty, which in combination, if not individually, proximately caused James Waites's abuse of Stephanie. First, Ashtabula County extension agent Thomas Hopkins and Ashtabula County small animal committee member Kitty Butler conferred apparent legitimacy on Waites by hiring him as a fair judge and clinic instructor despite actual knowledge that he was a convicted child molester. Second, Hopkins failed to warn the Ashtabula County 4–H club advisors or parents of Waites's conviction. This negligent failure to warn resulted in the All–County Kids club advisors, Chris Malnar and Cindy Maddox Cook, and the parents of club members unwittingly allowing Waites unfettered access to the children.

Ohio courts describe the tort of negligence as consisting of three elements: duty, breach of duty, and injury proximately caused by the breach of duty. See *Littleton v. Good Samaritan Hosp. & Health Ctr.* (1988), 39 Ohio St.3d 86, 92, 529 N.E.2d 449, 454–455; *Strother v. Hutchinson* (1981), 67 Ohio St.2d 282, 285, 21 O.O.3d 177, 179, 423 N.E.2d 467, 469–470; *Malone v. Miami Univ.* (1993), 89 Ohio App.3d 527, 529, 625 N.E.2d 640, 641–642; *Abram & Tracy, Inc. v. Smith* (1993), 88 Ohio App.3d 253, 261, 623 N.E.2d 704, 709–710. Whether there exists a duty for purposes of a negligence action is a question of law for the court. *Mussivand v. David* (1989), 45 Ohio St.3d 314, 318, 544 N.E.2d 265, 269–270.

The general rule is that a person owes no duty to act for the protection of others.

"The fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action." Restatement of the Law 2d, Torts (1965) 116, Section 314.

Thus, under the general rule, OSU would not have any duty to protect its 4–H members. Two exceptions to this general rule impose a duty of reasonable care upon OSU: the negligent hiring exception and the "special relationship" exception.

One exception to the general rule of nonliability for the acts of third parties is that a principal may be liable for the negligent hiring of an agent. See *Albain v. Flower Hosp.* (1990), 50 Ohio St.3d 251, 257, 553 N.E.2d 1038, 1044–1045; Restatement of the Law 2d, Agency (1958) 458–460, Section 213 and Comment *d*. For example, in *Akins v. Estes* (Tex.App.1994), 888 S.W.2d 35, the court held that the Boy Scouts of America and the regional Boy Scout council could be liable for negligently hiring a volunteer scoutmaster despite the fact that neither entity exercised direct control over the daily activities of local scout troops or their adult leaders. The court stated that, because they work with children, youth organizations must be held to an even higher standard of care when hiring youth leaders:

"As stated by the Supreme Court of New Jersey, '[o]ne dealing with the public is bound to use reasonable care to select employees competent and fit for the work assigned to them and to refrain from retaining the services of an unfit employee.' *Di Cosala v. Kay*, 91 N.J. 159, [172] 450 A.2d 508, 515 (1982). * * * [O]rganizations such as the Boy Scouts, whose primary function is the care and education of children, owe a higher duty to their patrons to exercise care in the selection of their workers than would other organizations. *Doe v. Boys Clubs of Greater Dallas, Inc.*, 868 S.W.2d [942] at 951 [1994]. A higher standard of care is owed to children than to similarly situated adults." *Id.*, 888 S.W.2d at 42–43. See, also, *Wilson v. Tobiassen* (1989), 97 Or.App. 527, 530–532, 777 P.2d 1379, 1382 (affirming verdict against Boy Scouts of America and regional council for

sexual molestation by scoutmaster on theory of negligent supervision of scoutmaster).

The court in *Akins* concluded that Boy Scouts of America and its regional council had a duty to fire the scoutmaster if they knew or had reason to know he was unfit. *Id.*, 888 S.W.2d at 43. "An employer who negligently hires or retains in his employ an individual who is incompetent or unfit for the job may be liable to a third party whose injury was proximately caused by the employer's negligence." *Id.* at 42.

I would hold that a convicted child molester is presumptively incompetent and unfit to work directly with children and that a youth organization is negligent if it knowingly allows a convicted child molester to work with its members without issuing reasonable warnings.[4] In this case, Hopkins and Butler, despite having actual knowledge that Waites is a convicted child molester, hired Waites as a fair judge and clinic instructor to work with the children, yet failed to warn those who were in a position to protect them.

I disagree with the majority's conclusion that OSU owed no duty to Stephanie on the ground that it was not foreseeable that its conduct would facilitate Waites's molestation of 4–H members. Hiring Waites as a fair judge and clinic instructor could serve only to foster Waites's prominence, respectability, power, and influence in the 4–H community. 4–H promoted its goat clinics with advertising featuring Waites's name and describing the value of the clinic in terms of Waites's role as a fair judge.[5] A videotape of the August 8, 1989 Ashtabula County Junior Fair Goat Show reveals Waites speaking and working closely with the children and their goats. While OSU and the majority conclude that hiring Waites to work the fairs and clinics was safe and reasonable because

---

4. In this case, OSU both (1) allowed a convicted child molester to work directly with the children as a judge and instructor, and (2) failed to warn club advisors or parents of the conviction. Therefore, I express no opinion on the questions of whether it is ever reasonable and nonnegligent for a youth organization (1) to utilize a convicted child molester in any capacity, or (2) to allow a convicted child molester to work with children after warning parents.

5. Ashtabula County 4–H promoted its May 27, 1989 goat clinic with a press release published locally announcing: "The instructor at the clinic will be Mr. James Waites who will also serve as the judge at this year's Junior Fair Goat Show." The May 5, 1990 and April 13, 1991 goat clinics were promoted with fliers featuring Waites's name that were distributed to the members of the All County Kids club. The 1990 flier read:
 "BRING YOUR GOAT TO THIS CLINIC.
 "YOU WILL BE PRACTICING SHOWMANSHIP.
 "OUR SPEAKER FOR THE CLINIC IS: MR. JAMES WAITES from PERRY, OHIO
 "MR. WAITES WILL ALSO BE OUR JUDGE FOR THE COUNTY FAIR SO THIS WILL BE A GOOD OPPORTUNITY TO FIND OUT JUST WHAT HE WILL BE EXPECTING AT JUDGING."

Waites would presumably always be in public view, the fact is that repeatedly giving Waites a public forum in which to display the authority conferred upon him by 4–H served to legitimize a convicted child molester. Waites seduced Stephanie by telling her that he was a fair judge and former 4–H advisor, and he enticed parents by telling them he could help the children get 4–H scholarships. It was indefensible for Hopkins to conclude that he or anyone else could promote the involvement of a convicted child molester in the lives of 4–H members without subjecting the children to an unreasonable risk of sexual assault.

The other exception to the general rule of nonliability for the acts of third parties is that an actor owes a duty to exercise reasonable care to protect those with whom the actor has a special relationship from the conduct of third persons. See *Fed. Steel & Wire Corp. v. Ruhlin Constr. Co.* (1989), 45 Ohio St.3d 171, 173–174, 543 N.E.2d 769, 772 (citing cases). Restatement of the Law 2d, Torts (1965) 122, Section 315, states the rule:

"There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless

"(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

"(b) *a special relation exists between the actor and the other which gives to the other a right to protection.*" (Emphasis added.)

Section 314A of the Restatement lists four specific "special relationships" and the following caveat: "The Institute expresses no opinion as to whether there may not be other relations which impose a similar duty." The comments to Sections 314 and 314A express the same idea, that courts may recognize additional special relationships to expand the exception to the general rule:

"The result of the [general] rule has been a series of older decisions to the effect that one human being, seeing a fellow man in dire peril, is under no legal obligation to aid him, but may sit on the dock, smoke his cigar, and watch the other drown. Such decisions have been condemned by legal writers as revolting to any moral sense, but thus far they remain the law. It appears inevitable that, sooner or later, such extreme cases of morally outrageous and indefensible conduct will arise that there will be further inroads upon the older rule." Section 314 of the Restatement, Comment *c*, paragraph 3.

" * * * The relations listed are not intended to be exclusive, and are not necessarily the only ones in which a duty of affirmative action for the aid or protection of another may be found. * * * The question is therefore left open by the Caveat * * *. The law appears, however, to be working slowly toward a recognition of the duty to aid or protect in any relation of dependence or of mutual dependence." Restatement, Section 314A, Comment *b*.

The trend has indeed been for courts to increase the number of instances in which a duty is imposed on the basis of special relationships. *Tarasoff v. Regents of Univ. of California* (1976), 131 Cal.Rptr. 14, 23, 551 P.2d 334, 343, fn. 5 (holding that when a psychological therapist determines that a patient presents a serious danger of violence to another, the therapist owes a duty of reasonable care to protect the intended victim). When imposed, the duty is only "to exercise reasonable care under the circumstances." Section 314A of the Restatement, Comment *e*.

Courts must consider all relevant circumstances when imposing duties:

" * * * There is no formula for ascertaining whether a duty exists. Duty ' * * * is the court's "expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." (Prosser, Law of Torts (4th ed. 1971) pp. 325–326.) Any number of considerations may justify the imposition of duty in particular circumstances, including the guidance of history, our continually refined concepts of morals and justice, the convenience of the rule, and social judgment as to where the loss should fall.' " (Citations omitted.) *Mussivand*, 45 Ohio St.3d at 318, 544 N.E.2d at 270.

Because children are among the most vulnerable members of our society, the law, in ways too numerous to count, makes special provision for their well-being.[6] Youth organizations that undertake to provide learning experiences for children are particularly susceptible to attracting child molesters, who use organizations like 4–H[7] as a pool from which to select their victims. Pedophiles pose a

---

6. One example is R.C. 3319.20 and 3319.52, which require prosecutors to inform the employing board of education when school employees are convicted of certain offenses. Another example is *Bowman v. Parma Bd. of Edn.* (1988), 44 Ohio App.3d 169, 542 N.E.2d 663. In *Bowman*, the court affirmed summary judgment in favor of the defendant school board and against the administrator of the estate of a teacher who had committed suicide after public revelation of his pedophilia. The teacher had agreed to resign pursuant to a settlement agreement in which the board agreed: " 'No further references or other statements related to Ginebaugh's employment will be given unless required by Court order.' " *Id.* at 171, 542 N.E.2d at 665. Less than a month later, however, a member of the Parma School Board informed a member of the school board that hired the decedent of the decedent's pedophilia. The court held that, as to disclosures of pedophilia, the nondisclosure clause of the settlement agreement was unenforceable. The *Bowman* court's rationale aptly explains my rationale for holding that Hopkins owed a duty to warn of Waites's pedophilia:

"The evidence implicating Phillip Ginebaugh as a man entirely unsuited for the teaching profession is clear. * * * Phillip Ginebaugh's decision to remain in the teaching profession undermines any validity the non-disclosure clause might otherwise have possessed. This court will not countenance an action for breach of such a clause upon such unchallenged facts as those in the instant case, for to do so would be to expose our most vulnerable citizens to a completely unacceptable risk of physical, mental and emotional harm." *Id.* at 172, 542 N.E.2d at 666.

7. The mission of 4–H is to provide learning experiences for children between the ages of five and eighteen. Ohio 4–H Program Agent's Handbook (3d rev. 1994), 1.1.

particular danger because of children's naiveté in sexual matters and because "there is little evidence that race, religion, intelligence, education, occupation, or social class can differentiate a child molester or pedophile from the general population." Fuller, Child Molestation and Pedophilia: An Overview for the Physician, Journal of the Am. Med. Assn. (Jan. 27, 1989) 602, 603. It is common knowledge that pedophiles use lies and threats to lure and silence children, and Waites used both, telling people he was innocent of the 1984 molestation charges, telling 4–H advisors, members, and parents that he was a healthcare worker, and stating that he did not want to be left alone with the children because he did not want anybody "accusing him of anything." After molesting Patty Bailey and Sabrina Bailey, Waites told them they would get in trouble if they told anyone. *State v. Waites* (Aug. 22, 1994), Lake App. No. 93–L–009, unreported, at 3–4, 1994 WL 590289. After molesting Terra Koch, he told her that, if she told anyone, they would get in a lot of trouble, she would be sent to a foster home or private school, and her parents would hate her. Waites told Stephanie that if she did not remove her clothes so he could put some medicine on her, she would require surgery on her reproductive system.

The mission of youth organizations to educate children, the naiveté of children, and the insidious tactics employed by child molesters dictate that the law recognize a special relationship between youth organizations and their members such that the youth organizations are required to exercise reasonable care to protect their members from the foreseeable conduct of third persons. Such a holding is supported by the opinions of foreign courts that have addressed the question of how the Restatement's "special relationship" concept should be applied to situations in which the defendants took inadequate action to prevent a known pedophile from sexually abusing the plaintiffs.

Courts have said that neighbors, relatives, and youth organizations can be in a special relationship with children so as to create a duty. In *Pamela L. v. Farmer* (1980), 112 Cal.App.3d 206, 169 Cal.Rptr. 282, the court reversed judgment on the pleadings and held that the wife of a known pedophile had a special relationship with the plaintiff children because she invited the children to her home to play in the swimming pool under the exclusive supervision of her husband. The court wrote:

" * * * [T]he necessary special relationship between respondent and plaintiffs in this case can be inferred. The trend has been to expand the list of special relationships which justify imposing liability. * * * In this case plaintiffs were dependent upon respondent because plaintiffs are children. Being of tender years they were particularly vulnerable to this sort of misconduct and not fully able to protect themselves against it. * * * In inviting the children to her home, respondent assumed that special relationship. Respondent recognized that spe-

cial duty and relationship when she assured plaintiffs' parents it would be safe for them to play at her house." *Id.* at 211, 169 Cal.Rptr. at 285. See *Chaney v. Superior Court* (1995), 39 Cal.App.4th 152, 157, 46 Cal.Rptr.2d 73, 76 ("Without knowledge of her husband's deviant propensities, a wife will not be able to foresee that he poses a danger [to the family friend and frequent visitor]").

In *N.W. v. Anderson* (Minn.App.1991), 478 N.W.2d 542, the court held that the plaintiffs' landlords did not owe a duty to warn them of the fact that a co-tenant was a convicted child molester. The court grudgingly affirmed summary judgment in favor of the landlords based on state Supreme Court precedent holding that a duty to warn exists only when the actor knows of specific threats against specific victims. *Id.* at 544. Left to decide the issue of duty in the absence of this precedent, the court stated that it would have held that the landlords did owe a duty to warn:

"In this case, the following facts exist which may have made the sexual assault foreseeable: the Andersons [the landlords] knew Bearbower was a convicted sex offender for an offense against a young female child; the Andersons knew that when appellants moved onto the farm, Bearbower was still on probation for the sex offense; the Andersons knew appellants' family included young children; the Andersons knew Bearbower raised rabbits near the trailer which attracted the children; and the Andersons never advised appellants that Bearbower had a history of sexual misconduct against children." *Id.,* 478 N.W.2d at 544.

The court expressed its distaste for having to follow the restrictive precedent:

"We note that this is an extremely tortious [*sic,* tortuous] case and we are troubled by the decision we are required to make. The harm to N.W. may have been prevented by the Andersons had they simply warned appellants about Bearbower. We believe the risk to N.W. was not so speculative that, as matter of law, the Andersons were under no duty to warn appellants of Bearbower's dangerous propensities. Yet under the rule set forth in *Cairl* [*v. State,* 323 N.W.2d 20 (1982) ]—that there must be a specific threat against a specific victim—we are compelled to hold the Andersons had no duty to warn appellants." *Id.*

The court was unequivocal that it believed the law should impose on the landlords a duty to warn.

"We believe the standard set forth in *Cairl* does not comport with reality or the facts of this case. It would be a rare case where a child molester would make a specific threat against a specific victim. Nevertheless, the indication of impending danger or harm may be so great, that a duty to warn should be imposed on those who could reasonably prevent the harm from occurring.

"Except for the restrictive language in *Cairl*, we feel the danger to N.W. was so compelling or foreseeable, that the Andersons may have had a duty to warn appellants of Bearbower's dangerous proclivities." *Id.*, 478 N.W.2d at 544–545. See *Smith v. Orkin Exterminating Co.* (La.App.1989), 540 So.2d 363, 368 (holding that because exterminating business sends employees into homes, it owes a higher standard of duty to protect against intentional torts than does a regular business); *Williams v. Butler* (La.App.1991), 577 So.2d 1113, 1116 (applying *Smith* to case involving supervisor of public recreation center, who "was placed in a position of authority over young children," thereby creating duty on the part of the employer).

Similarly, relatives of children can be in a special relationship with them. In *A.R.H. v. W.H.S.* (Mo.App.1994), 876 S.W.2d 687, the court, reversing judgment on the pleadings, held that a grandmother who knew that her husband had sexually assaulted her granddaughter could be liable for negligence for the subsequent sexual assaults. In *T.A. v. Allen* (1995), 447 Pa.Super. 302, 669 A.2d 360, three grandchildren accused their stepgrandmother of negligence for not warning or protecting them from their natural grandfather, the defendant's husband, whom the defendant knew to be a pedophile. The trial court found for the plaintiffs, but a five-judge majority of the superior court reversed, relying solely on the law of premises liability. However, in a partial dissent relying on Comment *c* to Section 314 of the Restatement, two members of the court wrote that they would hold that the stepgrandmother did owe a general duty to warn the grandchildren that her husband was a pedophile:

" * * * The facts of this case strongly implicate 'our ideas of morals and justice' and 'the mores of the community.' Appellees, while mere licensees, were children. They were particularly ill-equipped to recognize and deal with the danger posed by their grandfather. The bizarre details of Eugene Allen's pedophilic practices which came out at trial demonstrate the exceptional magnitude of this danger. Also, Elizabeth Allen had first-hand knowledge of her husband's pedophilic practices. These weighty factors must coalesce into some kind of duty." *Id.* at 317, 669 A.2d at 367 (Olszewski, J., concurring in part and dissenting in part).

Youth organizations also can be in a special relationship with their members. In *L.P. v. Oubre* (La.App.1989), 547 So.2d 1320, the court, reversing partial judgment on the pleadings, held that the Boy Scouts of America and the regional Boy Scout council could be liable for failing to warn scouts and their parents that the scoutmaster was a pedophile.

"We further recognize the legal principle that an actor has no duty to control the conduct of a third person so as to prevent him from causing physical harm to another unless a special relationship exists between the actor and the other so as

to afford the other a right to protection. We decline to adopt the arguments of Istrouma [the regional council] and BSA, that the existence of a special relationship is limited to those found in current reported decisions or that it arises through payment of a fee. The law is not a static concept, both civilian and common theory provide for its application and extension as the case arises. * * * Plaintiffs have pleaded the existence of a special relationship between themselves, Oubre [the scoutmaster], Istrouma and BSA. Where such relationship exists, the law currently characterizes the duty as one to warn of risks of which the actor knew or should have known. * * * " *Id.* at 1324.

The duty of youth organizations to exercise reasonable care to protect against the foreseeable conduct of third persons is limited to the organization's members and other children significantly connected with the organization. There is no duty to protect the community at large. See Section 314A of the Restatement, Comment *c* (duty contemplates only risk of harm arising in the course of the relationship).

As counsel for OSU conceded at oral argument, OSU owed a general duty to exercise reasonable care to protect its 4–H members against the foreseeable conduct of third persons. The next question is whether OSU breached that duty, or in other words, whether under the circumstances OSU's general duty to exercise reasonable care required OSU to take action specifically regarding Waites, the least burdensome action being warning Ashtabula County 4–H club advisors or parents that Waites was a convicted child molester. OSU argues that it cannot be charged with this specific duty because the Ashtabula County 4–H agent, Hopkins, did not even know that Waites was involved with 4–H in Ashtabula County, other than with the events for which Hopkins hired him, judging fairs and running 4–H clinics.

Although Hopkins did not know of Waites's other involvement with Ashtabula County 4–H, once he received Jodi Black's memo, he owed a specific duty either to find out whether Waites was involved with a 4–H club or to warn the Ashtabula County 4–H club advisors that Waites was a convicted child molester so that they could protect the children. Hopkins breached this duty. Hopkins failed to warn the people who most needed the information regarding Waites, the club advisors and parents. When Hopkins failed to warn the club advisors or parents of Waites's conviction, they had no reason to let Hopkins know that Waites was involved with the club.

4–H's salaried line-management personnel in Ashtabula County consists of just two people, county extension agent Hopkins and a part-time home economics agent. The mission of 4–H is carried out mostly through the work of volunteers, who run the clubs with little organizational oversight. Under the 4–H structure, a county extension agent like Hopkins would probably not know when uninformed

club advisors are allowing someone the agent knows to be a pedophile to work with 4–H members. Black did not know whether Waites was involved with 4–H in Ashtabula County or elsewhere; that is why she sent the warning memo to all eighty-eight county extension agents. Similarly, because Hopkins was not in a position within the organization to know whether Waites was involved with 4–H in Ashtabula County, he had a duty either to investigate himself or to warn the people that would know, the club advisors. The fact that Hopkins would not know of Waites's involvement with the All–County Kids club made it imperative that he inform the club advisors that Waites was a convicted child molester.

Upon learning of Waites's conviction and involvement with 4–H, OSU, through Black's memo, began the process of fulfilling its duty to protect its members by disseminating the information of Waites's conviction to those who were in a position to protect the children. This process broke down in Ashtabula County. Hopkins breached the duty by failing to pass the information on to all of the Ashtabula County 4–H club advisors. Malnar and Maddox Cook subsequently encouraged their club members to work one-on-one with Waites, making Waites's abuse of them highly probable, if not inevitable. This failure by Hopkins constituted a breach of the duty to take reasonable care to protect 4–H members from the foreseeable risk Waites presented.

After receiving Black's memo, Hopkins raised the issue of Waites at the April 9, 1990 meeting of the Ashtabula County 4–H small animal committee. Although the memo was addressed to "County Extension Personnel Responsible for Hiring Junior Fair Judges," and although Black's intent was that the memo be passed on to the county committees hiring junior fair judges, Hopkins did not distribute or display Black's memo. At the meeting, Butler defended her friend Waites, stating that based on what she heard from friends, Waites was innocent despite his no contest plea. As county extension agent, Hopkins was the ultimate authority in Ashtabula County on 4–H matters. Relying on Butler, Hopkins took no other action on Black's memo and, instead, agreed to hire Waites again. Hopkins's reasoning for siding with Waites is inconsistent. Hopkins testified that he relied both on Kitty Butler's recommendation that Waites was innocent of the 1984 charge and on the belief that Waites should be given a "second chance."

Although all club advisors, including Malnar and Maddox Cook, were members of the small animal committee and received copies of the minutes of committee meetings, the minutes of the April 9, 1990 meeting do not mention the committee's discussion of Waites.[8] Because the minutes were silent, and because neither

---

8. Hopkins speculated that the secretary at the meeting may have excluded the committee's discussion of Waites's conviction because the secretary may have considered it "insensitive to

Malnar nor Maddox Cook attended that meeting, Maddox Cook did not learn of Waites's 1984 conviction until after the 1992 molestations were publicized.

With club advisors Malnar and Maddox Cook lacking the information they should have had, that Waites was a convicted child molester, and Hopkins lacking the information that he should have had, that Waites was involved with the club, Malnar and Maddox Cook encouraged contact between Waites and club members. Malnar and Maddox Cook introduced Stephanie to Waites in the fall of 1991 and lauded him as a goat expert, "the man to talk to about your goats." Shortly after Waites took Stephanie and her father to buy her first goat, Waites and Maddox Cook went to Stephanie's home to dehorn the goat. Waites visited Stephanie's home five times after that and telephoned her five or six times. Terra Koch, another of Waites's victims, was introduced to Waites by a 4–H advisor at the 1989 Ashtabula County 4–H goat clinic. Malnar also met Waites for the first time at a 4–H clinic. Malnar told Terra and her mother to call Waites if they needed help with her goat. Malnar and Maddox Cook told members at a club meeting that Waites was the expert to call. Stephanie's mother and Terra's mother testified that Waites was promoted as an integral part of their daughters' 4–H experience. Stephanie considered Waites "like an advisor" and called him when she had questions about her goat. Maddox Cook knew that Waites had previously been a 4–H volunteer in Lake County, and when asked by Terra's mother whether Waites was all right, Malnar responded, "Oh, yes, he just loves kids and goats, and he has been in 4–H for years."

According to Terra, Waites attended nine or ten meetings of the All–County Kids club in 1990, eight or nine meetings in 1991, and one or two meetings in 1992. Terra's mother also testified that Waites attended and spoke at no fewer than five or six club meetings. One meeting was held at Waites's home. Stephanie also testified regarding Waites's attendance at a club meeting. Waites did not merely attend club meetings as a parent. He assisted the advisors, served as the expert instructor at meetings of the All–County Kids club, and went with the advisors to the members' homes. Waites also drove club members to meetings and to fairs in Ohio and Pennsylvania.[9]

Still, OSU would escape liability if Waites's molestation of club members were not a foreseeable consequence of the access and status 4–H accorded him. The majority does plaintiffs a disservice by limiting its analysis of their negligence

include names and talk about those kinds of discussions in the set of minutes, * * * knowing that these [minutes] are going to be distributed to homes by mail * * *."

9. Maddox Cook became a club advisor in 1991. She testified that she could not remember whether Waites ever attended a club meeting. At oral argument, counsel for OSU conceded that Waites attended and drove members to and from club meetings.

theory to the hiring of Waites as a fair judge and clinic instructor. Although I disagree with its conclusion, the majority thoroughly discusses the negligent hiring component of appellants' case. The majority fails, however, to discuss the greater part of the negligence attributable to OSU: the duty to warn arising from the special relationship between 4–H and the children and the failure of Hopkins to warn his club advisors or members' parents of Waites's conviction. This breach resulted in Malnar, Maddox Cook, and the parents continuing to allow Waites supervised and unsupervised access to the children. Stephanie's injury was the foreseeable result of the dual breaches of duty: failure to warn and negligent hiring.

Section 302B, Restatement of the Law 2d, Torts (1965) 88, addresses the specific issue of foreseeability of intentional or criminal conduct:

"An act or an omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the conduct of the other or a third person which is intended to cause harm, even though such conduct is criminal."

I expect the framers of Section 302B had cases like this one in mind when they drafted the accompanying Comments *d* and *e:*

"*d.* * * * In the ordinary case [the actor] may reasonably proceed upon the assumption that others will not interfere in a manner intended to cause harm to anyone. * * *

"*e.* There are, however, situations in which the actor, as a reasonable man, is required to anticipate and guard against the intentional, or even criminal, misconduct of others. In general, these situations arise where the actor is under a special responsibility toward the one who suffers the harm, which includes the duty to protect him against such intentional misconduct; or where the actor's own affirmative act has created or exposed the other to a recognizable high degree of risk of harm through such misconduct, which a reasonable man would take into account. The following are examples of such situations.

" * * * *

"D. Where the actor has brought into contact or association with the other a person whom the actor knows or should know to be peculiarly likely to commit intentional misconduct, under circumstances which afford a peculiar opportunity or temptation for such misconduct."

The issue, therefore, is whether it is foreseeable that a convicted child molester will commit another pedophilic crime if placed in a position of leadership, authority, or responsibility in a youth organization without issuing reasonable warnings. Or, to paraphrase the Restatement's comments, whether the youth organization realizes or should realize that the child molester's sanctioned in-

volvement with the youth organization involves an unreasonable risk of harm to the children, whether the youth organization should be required to anticipate and guard against the child molester's pedophilic proclivities, whether the youth organization is under a special responsibility toward its members to protect them against such intentional misconduct, whether the youth organization's own affirmative act has created or exposed its members to a recognizable high degree of risk of harm through such misconduct, which a reasonable person would take into account, or whether the youth organization has brought its members into contact or association with the child molester, whom the organization knows or should know to be peculiarly likely to commit a pedophilic crime under circumstances which afford a singular opportunity or temptation for such misconduct.

The scientific literature, legislative pronouncements, and judicial opinions support the conclusion that the magnitude of the risk—the foreseeability—that a known child molester will commit a pedophilic offense when placed in a position of leadership, authority, or responsibility in a youth organization without reasonable warnings requires that the youth organization be held liable.

Child molesters usually do not limit themselves to one victim. Fuller, Child Molestation and Pedophilia, *supra,* at 603. In the largest study of pedophiles ever undertaken, an analysis of five hundred seventy-one cases showed that those who admitted to probation officers to one to four incidents of molesting young girls admitted to an average of twenty-three incidents when guaranteed anonymity. Meyer, Abnormal Behavior and the Criminal Justice System (1992) 94. Of course, most convicted child molesters are not allowed to work with youth organizations.

Legislatures have responded to the particular risk posed by pedophiles with registration and public notification laws. Statutorily mandated child abuse registries proliferated in the 1970s. Note, The Constitutionality of Employer-Accessible Child Abuse Registries: Due Process Implications of Governmental Occupational Blacklisting (1993), 92 Mich.L.Rev. 139. In response to the particular risk of recidivism of sex offenders, the Ohio General Assembly instituted required registration of habitual sex offenders in 1963. See R.C. 2950.01 to 2950.08. Increasingly since 1993, states have been implementing sex offender notification statutes. See Note, There Goes the Neighborhood: Notifying the Public When a Convicted Child Molester is Released into the Community (1995), 28 Ind.L.Rev. 715, 716; see, also, Comment, Examining Sex Offender Community Notification Laws (1995), 83 Cal.L.Rev. 885, 904; "Megan's Law": Community Notification and the Constitution (1995), 29 Colum.J.L. & Soc.Probs. 117, 120. The Washington and Idaho legislatures included in their sex offender registra-

tion/notification legislation findings of a higher risk of recidivism.[10] In May 1996 the federal government enacted "Megan's Law," Pub.L. 104–145, 110 Stat. 1345 (1996) (to be codified at Section 14071[d], Title 42, U.S.Code), which requires state and local law enforcement agencies to "release relevant information that is necessary to protect the public concerning a specific person required to register" under the now federally mandated state registration programs.

Court opinions also support the conclusion that it is foreseeable that a convicted child molester will commit a pedophilic offense when provided extraordinary access to unsuspecting children. In *Almonte v. New York Med. College* (D.Conn.1994), 851 F.Supp. 34, a ten-year-old hospital patient was sexually assaulted by a resident psychiatrist. The resident had undergone psychoanalysis with the defendant psychiatrist, during which the psychiatrist learned that the resident was a pedophile and that he planned on specializing in child psychiatry. The court denied the psychiatrist's motion for judgment on the pleadings and held that the psychiatrist had a duty to warn the resident's child patients of the resident's pedophilia:

" * * * [T]he plaintiffs allege that although Ingram knew that DeMasi was a pedophiliac and that he intended to pursue and practice child psychiatry, neither Ingram nor the College took any steps on the basis of this knowledge. Because the court finds that a self-confessed pedophiliac who intends to practice child psychiatry presents a foreseeable threat of harm to future minor patients, * * * the plaintiffs' complaint states a claim against Ingram and the College for failure to exercise reasonable care to protect Denny against such foreseeable harm." *Id.* at 41.

"Ordinary people do not commit outrages against others because they have relatively little inclination to do so, and because any inclination in that direction is suppressed by moral inhibitions and fear of the practical risks associated with the commission of crimes. A person with a history of rape or child molestation stands on a different footing. His past conduct provides evidence that he has the combination of aggressive and sexual impulses that motivates the commission of such crimes, that he lacks effective inhibitions against acting on these impulses, and that the risks involved do not deter him." Karp, Evidence of Propensity and

---

**10.** "The legislature finds that sex offenders pose a high risk of engaging in sex offenses even after being released from incarceration * * *." 1994 Wash.Laws ch. 3, Section 117, reprinted in Historical and Statutory Notes to Wash.Rev.Code Ann. 4.24.550 (West Supp.1996).

"The legislature finds that sex offenders present a high risk of reoffense and that efforts of law enforcement agencies to protect their communities, conduct investigations and quickly apprehend offenders who commit sex offenses are impaired by the lack of information available about individuals who have pled guilty to or have been found guilty of sex offenses who live within their jurisdiction." Idaho Code 18–8302 (Supp.1995).

Probability in Sex Offense Cases and Other Cases (1994), 70 Chi.–Kent L.Rev. 15, 20.

The Eleventh Circuit Court of Appeals made a similar observation:

"[S]ex offenders are subject to a continually recurring physiological urge which is part of their nature and requires the imposition of effective restraints in order to curb the habitual repetition of episodes producing the harmful consequences to the public resulting from the propensities of their nature." *Hendking v. Smith* (C.A.11, 1986), 781 F.2d 850, 852 (holding that a prison rule that excludes from certain privileges inmates with a history of violent sex offenses is reasonable and appropriate and not violative of the Equal Protection Clause); see *Lustgarden v. Gunter* (C.A.10, 1992), 966 F.2d 552, 555 (same); *Neal v. Shimoda* (D.Haw.1995), 905 F.Supp. 813, 819 (following *Hendking* and noting high risk of recidivism of untreated sex offenders).

In *Haddock v. New York* (1988), 140 A.D.2d 91, 98, 532 N.Y.S.2d 379, 383, affirmed (1990), 75 N.Y.2d 478, 554 N.Y.S.2d 439, 553 N.E.2d 987, the city of New York employed a man with a long criminal record, including one conviction of attempted rape and parole revocation based on another rape charge, to work at a children's playground. The man abducted and raped a nine-year-old girl at the playground. The jury awarded $3.5 million, but the trial court granted the city's motion for judgment notwithstanding the verdict, in part on the ground that the attack was not foreseeable. *Id.* at 482–483, 554 N.Y.S.2d at 442, 553 N.E.2d at 990. The Appellate Division reversed, reinstating the jury's verdict subject to remittitur. The New York Court of Appeals affirmed. Employment of a person with such a criminal history, the Appellate Division stated, subjected children at the playground to a clearly foreseeable risk of harm. *Id.* at 94–96, 532 N.Y.S.2d at 381. The city considered the criminal's job at the playground as not involving public contact or working with children. *Id.* at 480–484, 554 N.Y.S.2d at 440–442, 553 N.E.2d at 989–990. Similarly, 4–H's Hopkins testified that he thought that Waites was not a threat because of his presumed limited access to 4–H members.

The foreseeability at issue here—the foreseeability that defines the scope of the youth organization's liability—is not the foreseeability that a convicted child molester will commit another crime, or even that a convicted child molester will commit another sexual or pedophilic crime. Rather, the foreseeability at issue here—and to which I would limit the holding—is the foreseeability that a convicted child molester will commit another pedophilic crime if placed in a position of leadership, authority, or responsibility in a youth organization without warning members, parents, or staff that are in a position to protect the children. The effect of OSU's negligent hiring and negligent failure to warn was that Waites was made a judge, instructor, and mentor. This negligence provided him access to the children and the status to exploit that access. As should have been

anticipated, Waites used the postincarceration access and status given him by 4–H to molest more children. Waites's path to Stephanie was not merely foreseeable; it was the classic *modus operandi* of a child molester.

OSU owed a duty of care to Stephanie, and it breached that duty. OSU, through Hopkins, breached its duty to exercise reasonable care to protect its 4–H members by failing to warn Ashtabula County 4–H club advisors or parents [11] of Waites's conviction. This breach resulted in the All–County Kids club advisors and parents unwittingly allowing Waites unconscionable access to the children. Compounding the injurious effect of this breach, OSU, through Hopkins and Butler, breached its duty to exercise reasonable care in hiring fair judges and clinic instructors by hiring Waites, thereby bestowing upon him the imprimatur of 4–H's approval, despite actual knowledge that he was a convicted child molester. Appellants' second assignment of error should be sustained.

The third element of a negligence action is injury proximately caused by the breach of duty. The proximate cause element requires some reasonable connection between the defendant's negligent act or omission and the plaintiff's injury. Prosser & Keeton, *supra*, at 263, Section 41. Like the duty element, proximate cause is often expressed as a function of foreseeability:

"A person is not liable for proximately causing an injury if, under all of the circumstances, he did not foresee and, acting as a reasonably prudent person, could not have foreseen the consequences of his alleged negligent acts." *Jeffers v. Olexo* (1989), 43 Ohio St.3d 140, 539 N.E.2d 614, paragraph one of the syllabus.

Ohio courts also say that an injury is proximately caused by a breach of duty when the injury is the natural and probable consequence of the breach. The injury must have been, under the surrounding circumstances of the particular case, foreseeable or anticipated by the wrongdoer as likely to follow from the breach of duty. *Id.* at 143, 539 N.E.2d at 617; *Strother, supra,* 67 Ohio St.2d at 287, 21 O.O.3d at 180–181, 423 N.E.2d at 470–471; *Ross v. Nutt* (1964), 177 Ohio St. 113, 114, 29 O.O.2d 313, 314, 203 N.E.2d 118, 119–120; *Jeanne v. Hawkes Hosp. of Mt. Carmel* (1991), 74 Ohio App.3d 246, 252, 598 N.E.2d 1174, 1177–1178; *Grange Mut. Cas. Co. v. Fleming* (1982), 8 Ohio App.3d 164, 166–167, 8 OBR 223, 225–226, 456 N.E.2d 816, 818–820. An injury may have multiple proximate causes. *Taylor v. Webster* (1967), 12 Ohio St.2d 53, 41 O.O.2d 274, 231 N.E.2d 870; *Reed v. Weber* (1992), 83 Ohio App.3d 437, 441, 615 N.E.2d 253, 255–256.

The determination of whether a breach of duty was the proximate cause of an injury is usually termed a question of fact. *Strother, supra,* 67 Ohio St.2d 282, 21

---

11. Hopkins owed a duty to inform at least the club advisors. Because Hopkins warned neither the advisors nor the parents, it is not necessary to decide whether he owed a duty to inform the parents.

O.O.3d 177, 423 N.E.2d 467. A trial court's findings of fact are presumed to be correct and will not be reversed as being contrary to the manifest weight of the evidence if there is competent and credible evidence supporting the finding. *Wisintainer v. Elcen Power Strut Co.* (1993), 67 Ohio St.3d 352, 355, 617 N.E.2d 1136, 1138–1139; *Myers v. Garson* (1993), 66 Ohio St.3d 610, 614, 614 N.E.2d 742, 745; *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 79–80, 10 OBR 408, 410–411, 461 N.E.2d 1273, 1275–1277. By their third assignment of error, plaintiffs argue that the trial court erred in finding that it was not reasonably foreseeable that Waites would sexually molest Stephanie.

For the same reasons that the foreseeability of harm meant that OSU's general duty to exercise reasonable care required it to warn of Waites's conviction, the foreseeability of harm satisfies the proximate cause element of appellants' negligence claim.

In arguing that 4–H's decision to hire Waites, even if negligent, was not a proximate cause of Stephanie's injury, OSU relies on the facts that 4–H last hired Waites to run a 4–H goat clinic in April 1991, and that Stephanie was not a 4–H member at that time and did not meet Waites until the fall of 1991. OSU argues that because Stephanie was not a 4–H member at the time Waites was last in the paid service of 4–H, it was unforeseeable that Stephanie would be victimized. I do not dispute the proposition that it was unforeseeable which 4–H member Waites would victimize, but it was eminently foreseeable that Waites would victimize a 4–H member. The duty and proximate cause elements of a negligence claim do not require that a particular individual be the object of foreseeable harm. It is sufficient that the breach of duty is likely to result in injury to someone. *Williams v. Williams* (1990), 68 Ohio App.3d 529, 532, 589 N.E.2d 89, 91–92; *Strother, supra,* 67 Ohio St.2d at 287–288, 21 O.O.3d at 180–181, 423 N.E.2d at 470–472; *Mudrich v. Std. Oil Co.* (1950), 153 Ohio St. 31, 39, 41 O.O. 117, 121, 90 N.E.2d 859, 863–864; see *Semadeni v. Ohio Dept. of Transp.* (1996), 75 Ohio St.3d 128, 131, 661 N.E.2d 1013, 1016 (holding the Ohio Department of Transportation liable for the death of a motorist killed by a concrete block thrown from a highway overpass, on the ground that the department had a duty to foreseeable travelers to timely implement policy of installing protective fencing on overpasses).

The anonymous caller from Ross County foresaw the risk. Jodi Black and the 4–H administrators in Columbus foresaw the risk. Hopkins himself foresaw the risk but, rather than protecting 4–H members by removing Waites from the list of fair judges, preventing Waites from participating in any 4–H event, and warning 4–H club advisors of Waites's conviction, Hopkins filed away the warning missive from Jodi Black and withheld the critical information from club advisors, parents, and Waites's next set of victims.

OSU also argues that any negligence was not the proximate cause of Stephanie's injury because Waites never abused Stephanie at a 4–H event. OSU relies on Hopkins's assertion that he allowed Waites to judge fair competitions and run goat clinics only because the circumstances of the competitions and clinics were such that it would be unlikely that Waites would be alone with 4–H members. Although Hopkins recognized the danger that Waites posed, he unreasonably concluded that hiring Waites for the limited purpose of serving as a fair judge and a clinic instructor was an adequate safeguard against the admitted risk.

The law does not support OSU's argument that its liability should be limited to sexual assaults committed at 4–H events. Child molestation is not usually committed in plain view. Unless Waites was to be kept under constant surveillance during clinics and competitions, the likelihood existed that he could seduce a child into a clandestine location either during or after the 4–H events. The greater danger, however, was that Waites would use the institutional endorsement associated with being the 4–H judge and goat expert to lure children, their parents, and unsuspecting 4–H advisors into trusting a man they would not otherwise trust. That danger was realized: The All–County Kids club had eight or nine members during the 1991–1992 term, and Waites molested three members plus the sister of one of the members.

Waites's history of child molestation made it all but inevitable that he would molest a child again if placed in a position of leadership, authority, or responsibility in 4–H. The trial court's finding that Waites's abuse of Stephanie was not proximately caused by 4–H's negligence in failing to inform the Ashtabula County club advisors and 4–H's negligence in hiring Waites to serve as a fair judge and 4–H clinic instructor is contrary to the manifest weight of the evidence. To some extent the law imposes on each citizen the risk of being victimized by recidivist criminals. However, the law should not fail to address the risk of individual children being victimized by a recidivist child molester when that risk is created by a youth organization that has knowingly placed the child molester in its midst and promoted him as a teacher, a judge, and a role model. Plaintiff's third assignment of error should be sustained.

By their fourth assignment of error, plaintiffs correctly assert that the trial court erred in finding that Waites's sexual assault on Stephanie was an intervening event precluding the liability of the state. A finding of liability in this case is not precluded by the doctrine of the superseding cause. Waites's tortious conduct cannot be a superseding event, because that conduct was the very risk that gave rise to OSU's duty. See *Fed. Steel & Wire Corp., supra,* 45 Ohio St.3d at 176–177, 543 N.E.2d at 774–776; *Knor v. Parking Co. of Am.* (1991), 73 Ohio App.3d 177, 190, 596 N.E.2d 1059, 1067 ("The defendant cannot now argue that the actions of the kidnappers were a superseding cause of the plaintiff's injuries,

when it breached its duty to protect against the very type of criminal act that occurred."). An alleged superseding cause does not cut off liability when it is itself foreseeable. *Cascone v. Herb Kay Co.* (1983), 6 Ohio St.3d 155, 6 OBR 209, 451 N.E.2d 815, paragraph one of the syllabus; *Taylor v. Webster* (1967), 12 Ohio St.2d 53, 56, 41 O.O.2d 274, 275–276, 231 N.E.2d 870, 872–873; *Mouse v. Cent. Sav. & Trust Co.* (1929), 120 Ohio St. 599, 606, 167 N.E. 868, 870; *Turner v. Children's Hosp., Inc.* (1991), 76 Ohio App.3d 541, 558, 602 N.E.2d 423, 433–434. Appellants' fourth assignment of error should be sustained.

By their first assignment of error, plaintiffs argue that the trial court erred in finding that OSU is entitled to statutory immunity for Hopkins's failure to inform all of the club advisors and members of the small animal committee of Waites's conviction. I agree with plaintiffs.[12]

In *Reynolds v. State* (1984), 14 Ohio St.3d 68, 14 OBR 506, 471 N.E.2d 776, the Supreme Court of Ohio held that the state was immune from liability arising from "basic policy decisions" requiring exercise of discretion but could be liable for negligence in the performance of activities implementing those decisions. In *Crawford v. Ohio Div. of Parole & Community Serv.* (1991), 57 Ohio St.3d 184, 187–188, 566 N.E.2d 1233, 1236–1237, the court held that the decision to send one particular inmate to an outside Alcoholics Anonymous meeting was not a "basic policy decision" within the meaning of *Reynolds.*

" * * * The determination to send *one particular individual* to outside A.A. meetings cannot be said to be a 'basic policy decision' within the meaning of *Reynolds, supra.* Likewise, as demonstrated above, the determination is not characterized by the exercise of a high degree of official judgment or discretion. Rather, it is a decision that is operational in nature, relating to the day-to-day business of the [Columbus Reintegration] Center. As such, it is analogous to a ministerial act for which the state may be held liable. * * * " (Emphasis *sic.*) *Id.* at 187, 566 N.E.2d at 1237.

Similarly, because the decisions made by OSU agents regarding Waites's involvement with 4–H were decisions concerning only one person, Waites, and because these decisions were operational in nature, relating to the day-to-day business of county- and club-level 4–H administration, these decisions were not "basic policy decisions" protected by sovereign immunity. Therefore, OSU may be vicariously liable for the negligent decisions of its agents at issue here. Appellants' first assignment of error should be sustained.

Because I would reverse the decision of the trial court and enter judgment in favor of plaintiffs on the basis of the first four assignments of error, I would not

---

**12.** The majority ruled the first assignment of error moot based on its holding that OSU owed no duty to Stephanie.

reach the sixth, seventh, and eighth assignments of error. Because the evidence supports the trial court's finding that Owen, Maruschak, and Hopkins were not guilty of wanton misconduct, I concur in the majority's judgment regarding the fifth assignment of error.

For these reasons, I would sustain the first, second, third and fourth assignments of error, overrule the fifth assignment of error, and reverse the judgment of the Court of Claims of Ohio and remand this cause to that court with instructions to enter judgment in favor of plaintiffs on the issue of liability and proceed to trial on the issue of damages.