OPINION
Appellants, Kirk Bolser and Aimee Ruffner-Johnson, separately appeal the decision of the Butler County Court of Common Pleas, Juvenile Division, finding their daughter, Kiersten Bolser, to be a neglected and dependent child and granting Butler County Children Services Board ("BCCSB") temporary custody of Kiersten.
Bolser and Ruffner-Johnson are Kiersten's biological parents. When Kiersten was born on July 30, 1997, Bolser and Ruffner-Johnson were unmarried but living together. Kiersten was born with numerous medical conditions subsequently diagnosed to include prematurity, acute life threatening events, also known as sudden infant death syndrome ("SIDS"), gastroesophageal reflux, formula intolerance, possible seizures, and an unconfirmed suspicion of Muenchausen Syndrome by Proxy.
Bolser suffers from manic depression or bi-polar disorder and attention deficit disorder. He has received psychiatric treatment for many years. He is presently taking five medications for his conditions. As a result of the medications, he is often tired or asleep. During the course of these proceedings, Bolser's medications have been reduced to increase his interaction with Kiersten.
Ruffner-Johnson has also displayed many problems. She has previously surrendered two children to the permanent custody of BCCSB. She earlier had a child with Bolser. That child is now in the legal custody of Bolser's mother. Kiersten's doctor described Ruffner-Johnson as acting paranoid, angry, juvenile, and inappropriate toward him and his staff.
Kiersten's pediatrician, Dr. V. Wade Weatherington, became involved with Kiersten on August 6, 1997. He was initially concerned about Ruffner-Johnson's ability to properly follow up on Kiersten's potentially fatal illnesses. He noted that Bolser attended only one of Kiersten's numerous visits for treatment. After Ruffner-Johnson's behavior in the office became problematic, Dr. Weatherington asked Bolser to attend visits, but Bolser failed to show for further visits.
Dr. Weatherington explained that the SIDS disorders that Kiersten suffered from included apnea, or a cessation of breathing, and bradycardia, or a slowed heart rate. Dr. Weatherington was especially concerned because these conditions can be caused by problems with the brain or obstructions in Kiersten's airways. On the whole, though, evaluations of Kiersten's health showed her to be normal. A more detailed diagnosis was prevented by Ruffner-Johnson's behavior, her inability to effectively follow-up Kiersten's care, and her inconsistency and ambiguity regarding Kiersten's medical history and apnea and bradycardia episodes.
Bolser and Ruffner-Johnson were ordered to keep a log of Kiersten's health that medical professionals could use in evaluating Kiersten's conditions. Although Ruffner-Johnson claims to have kept such a log, it was not produced before the magistrate, and Dr. Weatherington has no record of the log being shown or given to him at any time. Kiersten was also placed on oxygen and two monitors for her apnea and bradycardia. These monitors had memory features which recorded when they were used. The memory reports showed that they were not used consistently.
In October 1997, Kiersten was admitted to Children's Hospital in Cincinnati, Ohio, after reportedly suffering a seizure. Because the seizure was a new condition which, together with apnea and bradycardia, may indicate a brain stem tumor or hydrocephalus, an MRI scan was scheduled for a few days after Kiersten's discharge from the hospital. The initial appointment was missed because Ruffner-Johnson arrived with Kiersten several hours after the scheduled appointment. A second appointment was missed when Ruffner-Johnson went to Hillsboro, Ohio for Thanksgiving.
It was also discovered that Kiersten suffered from reflux and two medications were prescribed for this condition. Dr. Weatherington noted that apnea and bradycardia can result from reflux in infants. But, for the child to suffer from such severe reflux as to cause life threatening events, the child would have to show signs of failure to thrive and esophageal inflammation which Kiersten did not display.
Home healthcare nurses were also involved in Kiersten's care. Jenna Stack was the primary healthcare nurse. She had contact with Bolser and Ruffner-Johnson, but she never observed Bolser provide any care to Kiersten. Seven of sixteen visits were cancelled by Ruffner-Johnson. Stack did note, though, that Ruffner-Johnson was able to implement some of the care techniques she was taught.
Because of the numerous concerns regarding Kiersten's health and treatment, Dr. Weatherington reported his concerns to BCCSB. BCCSB caseworker Renee White investigated the complaints by visiting Bolser and Ruffner-Johnson's home. White observed that Ruffner-Johnson was Kiersten's primary caregiver and that Bolser was generally asleep or sleepy during her visits. White spoke with Bolser about his sleeping habits, and Bolser informed her about his medications and their effects. Bolser admitted that because of these effects, Ruffner-Johnson is Kiersten's primary caregiver. Bolser admitted that he had trouble waking up to take care of Kiersten or being able to keep focused. Ruffner-Johnson was primarily responsible for making and keeping Kiersten's medical appointments. When Ruffner-Johnson was unable to do so, Bolser's mother handled the appointments.
On December 1, 1997, BCCSB filed complaints in the trial court alleging that Kiersten was a neglected and dependent child pursuant to R.C. 2151.03 and 2151.04. BCCSB was granted temporary custody by way of an ex parte order. On December 3, 1997, a shelter care hearing was held, and shelter care was continued at Ruffner-Johnson's request.
Pre-trial hearings were held on December 23, 1997 and February 9, 1998. Paternity tests were ordered at the first hearings. An initial adjudication hearing was held on June 10, 1998, during which Bolser admitted paternity. Based upon Bolser's admission and the results of the paternity tests, Bolser was found to be Kiersten's father. After hearing evidence regarding custody of Kiersten, the magistrate took the matter under advisement.
On June 30, 1998, the magistrate filed her adjudicatory decision and order finding that Kiersten was a neglected and dependent child and continuing BCCSB's temporary custody pending completion of the disposition hearing. A case plan was adopted for reuniting Bolser, Ruffner-Johnson, and Kiersten. Bolser, Ruffner-Johnson, and BCCSB filed objections to the magistrate's decision. The hearing on the objections was continued until after the disposition hearing, and the magistrate's order was adopted by the trial court as an interim order.
The disposition hearing was held before the magistrate on September 17, 1998. Bolser and Ruffner-Johnson both testified at this hearing, as well as White, Stack, and Dr. Weatherington. Dr. Weatherington reported that while in BCCSB's care Kiersten has not displayed the frequent health problems that she suffered when in Bolser and Ruffner-Johnson's custody.
The magistrate filed her dispositional decision and order on November 30, 1998. The magistrate continued BCCSB's temporary custody of Kiersten. Both parents were ordered to execute necessary releases of medical information to be provided to BCCSB, have two hours of supervised visits with Kiersten every week, conducted in their home if necessary, and to undergo psychological assessments at Children's Diagnostic Center ("CDC"). All prior, consistent orders were continued.
The magistrate found that Bolser had completed five or six parenting classes and showed a marked improvement in his testing scores. He completed an observed visit at CDC, but the examiner felt that further assessment was needed. Bolser had appropriate, but limited, interaction with Kiersten, which could be improved through coaching and assistance. Ruffner-Johnson did not complete individual counseling and her overall success at implementing parenting skills was questionable. Both parents missed the three most recent visits before the adjudicatory hearing.
Objections to the magistrate's decision were filed in the trial court on December 11 and 21, 1998. On February 2, 1999, Bolser filed a motion for expert witness fees so his psychiatrist could testify at the objections hearing about Bolser's psychiatric treatment. The trial court overruled Bolser's motion. An objections hearing was held on February 9, 1999, at which the trial court overruled all objections. The trial court adopted the magistrate's decision, but ordered that visitation was not to take place at Bolser and Ruffner-Johnson's residence. Bolser and Ruffner-Johnson appeal individually. Because many of the assignments of error concern identical or related issues, we address them together as necessary.
Bolser Assignment of Error No. 1:
 THE JUDGMENT OF THE TRIAL COURT IN ITS ADJUDICATION DECISION WAS CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE [AS] TO APPELLANT KIRK BOLSER.
Bolser Assignment of Error No. 2:
 THE TRIAL COURT ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT FATHER BY FAILING TO FIND THAT, AS A MATTER OF LAW, THAT [SIC] THE CHILD WAS NOT NEGLECTED WHILE IN THE CUSTODY OF APPELLANT KIRK BOLSER.
Bolser Assignment of Error No. 3:
 THE TRIAL COURT ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT FATHER BY FINDING THAT THE CHILD WAS NEGLECTED AND DEPENDENT UNDER THE OHIO REVISED CODE SECTION[S] 2151.03 AND 2151.04 BY ADMITTING INADMISSIBLE EVIDENCE THAT THE CHILD WAS A VICTIM OF THE "SUSPICION OF MUENCHAUSEN BY PROXY."
Ruffner-Johnson Assignment of Error No. 1:
 THE TRIAL COURT ERRED TO THE PREJUDICE OF THE APPELLANT MOTHER WHEN IT FOUND KIERSTEN TO BE A NEGLECTED AND DEPENDENT CHILD.
 In the above assignments of error, Bolser and Ruffner-Johnson contend that the trial court erred by finding that Kiersten was a neglected and dependent child. They argue that there was not clear and convincing evidence supporting these findings. Additionally, Bolser asserts that the trial court failed to find that Kiersten was in his custody or that he was her caregiver.
Before the trial court may take any action granting custody of a child to a public service agency, such as BCCSB, it must first hold an adjudicatory hearing and find by clear and convincing evidence that the child is abused, neglected, or dependent. R.C. 2151.35(A); In re Riddle (1997), 79 Ohio St.3d 259,262; In re Pieper Children (1993), 85 Ohio App.3d 318, 326, appeal dismissed, 66 Ohio St.3d 1410. Only after such a finding is made may the trial court hold a dispositional hearing, pursuant to Juv.R. 34 and R.C. 2151.35.3, to determine what action should be taken as to the placement of the child. The trial court's decision regarding disposition of the child is reviewed for an abuse of discretion. Riddle, 79 Ohio St.3d at 265; In re Ward
(1992), 75 Ohio App.3d 377, 379.
"Dependent child" is defined in R.C. 2151.04 to include "any child:"
 (B) Who lacks adequate parental care by reason of the mental or physical condition of the child's parents, guardian, or custodian;
 (C) Whose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship.
 The determination that a child is dependent requires no showing of fault on the parent's part. Instead, the focus is solely upon the child's "condition or environment," to determine "whether the child is without proper (adequate) care or support." Riddle, 79 Ohio St.3d at 262. When a child is receiving proper care from her parents or relatives to whom the parent has entrusted the child's care, then the child is not a dependent child. Id. A finding that the child is dependent must be supported by clear and convincing evidence, defined as "competent credible evidence by which the trial court could have formed a firm belief or conviction that the essential statutory elements for * * * dependency have been established." In re S. (1995), 102 Ohio App.3d 338, 344-345; R.C. 2151.35(A).
In the adjudication decision and entry, the magistrate found that Kiersten was a dependent child. A review of the magistrate's findings of fact reveals that this finding was based upon Kiersten's numerous medical conditions (R.C. 2151.04[C]), and Bolser not providing adequate care to Kiersten (R.C. 2151.04[B]).
Bolser claims that the trial court erred in making this finding, because the trial court relied upon allegedly improper testimony that Kiersten suffered from Muenchausen Syndrome by Proxy, meaning that some of Kiersten's symptoms were induced by Ruffner-Johnson and her failure of care. Dr. Weatherington was a qualified pediatrician with experience diagnosing and treating ailments afflicting children. He had extensive contact with Kiersten and was well-aware of her medical condition. That he may not have knowledge of every detail of Muenchausen syndrome went to credibility of his suspicion, not its admissibility.
More importantly, the magistrate's decision concentrated on those conditions which were confirmed in Kiersten's treatment, not those conditions she was suspected of suffering. Kiersten suffered from numerous medical problems, some of which could have proven fatal. She requires constant supervision and follow-up treatment, and she did not receive such proper care in the past. In fact, some of her conditions, including apnea and bradycardia, should not have been present in a child at her level of prematurity. This evidence was sufficient to find that R.C.2151.04(C) was applicable.
By appellant's own admissions, he suffers from mental illnesses, including manic depression or bi-polar disorder and attention deficit disorder. Because of these illnesses, he is prescribed five medications. When taking these medications at full dosages, he admits that he is rendered incapable of providing adequate care to Kiersten. Testimony from caseworker White supported this finding. The evidence was clear that, at the time of the adjudicatory hearing, Bolser had failed to provide adequate care to Kiersten through no fault of his own. There was sufficient evidence to find that R.C. 2151.04(B) was applicable.
Bolser further argues that the magistrate erred in finding Kiersten to be a dependent child because he was under no duty to provide care until paternity was established. Bolser is incorrect under the facts of this case. R.C. 3109.04.2, which establishes that an "unmarried female who gives birth to a child is the sole residential parent and legal custodian of the child until a court of competent jurisdiction issues an order designating another person as the residential parent and legal custodian[,]" does not absolve Bolser of all responsibility for his daughter's care.
Even before legal paternity was established, Bolser acted as a de facto parent and stood in loco parentis. He held out to the world that Kiersten was his daughter towards whom he owed parental duties. He placed himself in the situation of a lawful parent and assumed obligations incident to a parental relationship, including support and maintenance. See Evans v. Ohio St. Univ. (1996),112 Ohio App.3d 724, 736-737.
Bolser attended some medical appointments and was informed of what was necessary to Kiersten's care. He lived with Ruffner-Johnson and provided transportation to Kiersten's medical appointments. Although Ruffner-Johnson was Kiersten's primary caregiver, there is evidence to support the contention that Bolser would have assumed a greater role in Kiersten's care had he been able to at the time.
We must point out that by his argument, Bolser seems to state that his failure to provide adequate care to Kiersten was a reasoned choice, which would support a finding that Bolser neglected Kiersten. That Bolser would claim to have cared so little about Kiersten's health until paternity was proven could have been considered by the magistrate, if the magistrate had seen fit to review such facts.
The magistrate's decision, when read as a whole, clearly indicates that the finding that Kiersten was a dependent child was a finding relevant to her condition and Bolser's failure to provide adequate care. There was sufficient evidence of Kiersten's numerous medical conditions, the inadequate care Kiersten was receiving, and appellant's inability to provide care to support the finding that Kiersten was a dependent child.
"Neglected child" is defined in R.C. 2151.03 to include "any child:"
 (3) Whose parents, guardian, or custodian neglects the child or refuses to provide proper or necessary subsistence, education, medical or surgical care or treatment, or other care necessary for the child's health, morals, or well-being;
* * *
 (6) Who, because of the omission of the child's parents, guardian, or custodian, suffers physical or mental injury that harms or threatens to harm the child's health or welfare.
 Unlike a determination that a child is dependent, a determination that a child is neglected requires that the trial court find, first, that the child's parent is at fault and, second, that the child did not receive proper or adequate care. Riddle, 79 Ohio St.3d at 263. As with a finding that a child is dependent, a finding that a child is neglected must be proven by clear and convincing evidence. R.C. 2151.35(A); Riddle, 79 Ohio St.3d at 262.
A review of the magistrate's decision and the record reveals that the magistrate's finding that Kiersten was a neglected child concerns Ruffner-Johnson's failure to provide Kiersten with proper treatment and follow-up care. It was admitted that Ruffner-Johnson was Kiersten's primary caregiver. As primary caregiver, Ruffner-Johnson was entrusted with taking Kiersten to medical appointments and monitoring her health. Ruffner-Johnson failed to adequately perform these tasks.
Testimony established that Kiersten missed appointments because Ruffner-Johnson decided to go out of town, even though the appointments were scheduled long in advance. Kiersten was supposed to be monitored when sleeping, yet the records from the monitors show that they were used sporadically. A more detailed diagnosis of Kiersten's problems required that MRIs be performed, but Ruffner-Johnson never took Kiersten to the hospital for these procedures. The magistrate found that Ruffner-Johnson's excuses for these failures were not credible. The magistrate concluded that Ruffner-Johnson's actions jeopardized Kiersten's health and interfered with her proper treatment.
The evidence before the magistrate clearly and convincingly demonstrated that Kiersten lacked adequate medical care due to Ruffner-Johnson's refusal to properly follow-up with further treatment or to follow the instructions of the doctors. R.C.2151.03-(A) (3). Ruffner-Johnson's neglect of Kiersten's medical care adversely affected Kiersten's health and interfered with Kiersten receiving proper treatment. R.C. 2151.03(A) (6).
We find that the magistrate's decision that Kiersten was a dependent and neglected child was supported by clear and convincing evidence. Accordingly, the assignments of error are overruled.
Bolser Assignment of Error No. 4:
 THE TRIAL COURT ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT FATHER BY FAILING TO FIND IN ITS DISPOSITIONAL ORDER THAT THE APPELLANT FATHER PRESENTED NO DANGER TO THE CHILD AND THAT THERE WAS NO GROUNDS FOR CONTINUED REMOVAL OF THE CHILD.
Ruffner-Johnson Assignment of Error No. 2:
 THE TRIAL COURT ERRED TO THE PREJUDICE OF THE APPELLANT MOTHER WHEN IT CONTINUED THE TEMPORARY CUSTODY OF APPELLEE BCCSB AFTER THE DISPOSITIONAL HEARING.
Ruffner-Johnson Assignment of Error No. 3:
 THE TRIAL COURT ERRED TO THE PREJUDICE OF THE APPELLANT WHEN IT ALLOWED ONLY SUPERVISED VISITATION FOR TWO HOURS WEEKLY, WHEN THERE IS NO EVIDENCE THAT THE CHILD IS IN DANGER WHEN WITH THE MOTHER.
 In the above assignments of error, appellants contend that the trial court erred in continuing BCCSB's temporary custody of Kiersten. They further contend that the trial court abused its discretion by limiting visitation to two hours of supervised visits per week.
Juv.R. 29(D) and R.C. 2151.35.3(A) allow a court to choose between five placement options after an adjudicatory finding that a child is neglected or dependent, including:
 (2) Commit the child to the temporary custody of a public children services agency, a private child placing agency, either parent, a relative residing within or outside the state, or a probation officer for placement in a certified family foster home or in any other home approved by the court.
 The trial court's decision to place a neglected and dependent child in the custody of a children services agency is reviewed for an abuse of discretion. Ward, 75 Ohio App.3d at 379.
Temporary custody may be continued pursuant to R.C. 2151.41.9:
 (A) (1) Except as provided in division (A) (2) of this section, at any hearing held pursuant to R.C. section 2151.28 or 2151.35.3 of the Revised Code at which the court removes a child from the child's home, the court shall determine whether the public children services agency or private child placing agency that filed the complaint in the case, has custody of the child, or will be given the custody of the child has made reasonable efforts to prevent the removal of the child from the child's home, to eliminate continued removal of the child from the child's home, or to make it possible for the child to return safely home. The agency shall have the burden of proving that it has made those reasonable efforts. In determining whether reasonable efforts were made, the child's health and safety shall be paramount.
 In making its order continuing temporary custody in the children services agency, the trial court must describe in its findings of fact the efforts provided by the agency to the child's family and why those services did not prevent continued removal of the child from the child's home. R.C. 2151.41.9(B) (1). Once a court issues a dispositional order pursuant to R.C. 2151.35.3, it may review at any time the placement or custody of the child, the case plan prepared by the children services agency to reunify the child with her family, the actions of the agency in implementing that plan, or any other relevant aspect of the child's placement or custody, and the court may make any necessary or warranted changes to any of these items. R.C. 2151.41.7(A).
In her decision, the magistrate set forth the actions taken by BCCSB in attempting to reunify Kiersten and her parents. Bolser and Ruffner-Johnson were given parenting classes at Catholic Social Services. Both completed five of the six classes, although social workers had concerns about their class participation. Bolser's testing scores showed marked improvement. Although initial visitations occurred at Bolser's grandparents' home, this was discontinued due to inappropriate conduct by Ruffner-Johnson. Since that time, supervised visitations have taken place at BCCSB. Bolser's activity and interaction with Kiersten, although initially limited, has been improving. BCCSB and Children's Diagnostic Center examiners felt that further assessment was necessary to ensure that Bolser was properly implementing the skills and conduct taught in parenting classes.
Both parents were ordered to seek counseling. Bolser continued treatment for his mental conditions. His treating psychiatrist reduced his medications, making Bolser more responsive. Bolser has followed his doctor's medication and treatment recommendations. Unlike Bolser, Ruffner-Johnson was terminated by her therapist for missing appointments. Although Ruffner-Johnson is on a waiting list at another agency for individual counseling, she has made little progress in her treatment goals.
Kiersten's health improved during her time in BCCSB's temporary custody. She is developmentally on target. Her medical conditions have lessened. She has been taken off medications for her reflux, and she is doing well in her foster placement.
Just before the dispositional hearing, Bolser and Ruffner-Johnson changed residences. At the time of the magistrate's decision, BCCSB had not been able to inspect the new residence, because the agency was not notified of the new address. Both parents missed three of the visitation sessions in the month preceding the hearing. Neither Kiersten's paternal grandmother nor her paternal great-grandparents wish to have custody of her, and no other alternatives were presented.
These findings of fact support the magistrate's decision to continue temporary custody to BCCSB. BCCSB provided both parents with the opportunity to improve their parenting skills, develop their emotional maturity to better take care of Kiersten, and visit with Kiersten to develop stronger bonds with her. Although Bolser is making progress in his skills and interaction with Kiersten, further assessment and continued visitation are necessary before Kiersten can be released into his custody. Ruffner-Johnson's progress is doubtful.
Under the facts of this case, it was not an abuse of discretion for the magistrate to find that it was best to continue BCCSB's temporary custody of Kiersten. Nor was it an abuse of discretion to place limits upon visitation. The order, as adopted by the trial court, makes clear that should Bolser and Ruffner-Johnson show progress in their visitations, the length of their visitations with Kiersten may be increased. Should visitations go well, the trial court is empowered to order that future visitations take place at Bolser and Ruffner-Johnson's home.
We find that the trial court did not abuse its discretion in continuing temporary custody of Kiersten with BCCSB and reasonably limiting visitation until Bolser and Ruffner-Johnson show progress in the case plan goals. Accordingly, the assignments of error are overruled.
Bolser Assignment of Error No. 5:
 THE TRIAL COURT ABUSED ITS DISCRETION TO THE SUBSTANTIAL PREJUDICE OF APPELLANT FATHER BY FAILING TO AUTHORIZE AND PAY FOR APPELLANT'S EXPERT WITNESS.
 In his final assignment of error, Bolser contends that the trial court erred by not providing expert witness fees so that his psychiatrist could testify at the objections hearing. Bolser argues that his right to due process was violated when the trial court overruled his motion.
A trial court's decision regarding the payment of expert witness fees for indigent parties is a matter left to the trial court's discretion. State v. Broom (1988), 40 Ohio St.3d 277,283, certiorari denied (1989), 490 U.S. 1075, 109 S.Ct. 1089. An indigent party requesting payment for expert witness fees must show more than a mere possibility of assistance from an expert. The party must show a reasonable probability that the expert would aid in his case and that denial of expert assistance would result in an unfair result. Id. See, also, State v. Weeks (1989),64 Ohio App.3d 595, 598. In making its decision, the trial court should consider the availability of "alternative devices" which would fulfill the same functions as the expert assistance sought.Broom, 40 Ohio St.3d at 283.
The issue presented in the present case has been addressed inIn re Shaeffer Children (1993), 85 Ohio App.3d 683, appeal dismissed, 67 Ohio St.3d 1451. Although the trial court retains discretion in these matters, it must be remembered that it is well-established that parents have a fundamental interest in the care, custody, and management of their children. Id. at 689. Thus, when the state initiates proceedings to deprive parents of custody of their child, the parents must be provided with fundamentally fair procedures in accordance with the Due Process Clause of the Fourteenth Amendment of the United States Constitution and the due process guarantee of Section 16, ArticleI, of the Ohio Constitution. Id. at 689-690.
Shaeffer Children applied the test set forth in Mathews v.Eldridge (1976), 424 U.S. 319, 334-335, 96 S.Ct. 893, 903-904, to determine, in the context of permanent custody proceedings in which a parent's mental health is at issue, whether the trial court must appoint or pay for an expert psychiatrist to testify on behalf of the parent. That court found that "where the parent's mental health is the principal issue, the risk of erroneous deprivation is a serious one and the merits of the proposed procedural safeguard are significant. * * * [T]he state's interest in economic and administrative efficiency [is] comparatively weak and the prospective additional burden * * * relatively slight."Shaeffer Children, 85 Ohio App.3d at 691.
The present case does not present a situation as extreme as in Shaeffer Children, wherein the parent's mental health was "clearly the predominant issue from the outset and ultimately became the determinative issue." Id. Bolser's mental health and an understanding of the consequences of his treatment are important issues in the case. But at the time of the objections hearing, testimony from appellant's psychiatrist would not have necessarily altered the outcome. At that time, appellant's progress in fulfilling the case plan, and not his mental health, was a central issue. The magistrate found that appellant had made significant progress, but that further evaluation and progress was necessary. The magistrate's decision also showed that appellant was following his doctor's recommendations and that his interaction with Kiersten was improving. Testimony from appellant's psychiatrist would not have altered these findings.
Should BCCSB seek permanent custody, the trial court should then consider granting Bolser the fees, if requested, so that his psychiatrist may testify. When it must be determined whether Kiersten can be placed with Bolser, Ruffner-Johnson or both, the testimony of Bolser's psychiatrist will be central to deciding whether Bolser can be a fit parent. Before the magistrate or trial court can fully understand Bolser's mental health and treatment and the effects of these, testimony from his treating psychiatrist of over ten years is essential. This is especially so in light of the minimal cost to the court, approximately $300, as indicated in the letter from Bolser's psychiatrist.
We find that the trial court did not err in refusing to pay for Bolser's psychiatrist to testify at the disposition hearing, as such testimony was not necessary to resolve the issues involved. But the trial court should grant such fees should BCCSB seek permanent custody of Kiersten as Bolser's mental health and its effects will be central to determining whether Kiersten and he can be reunited within a reasonable time. Accordingly, the assignment of error is overruled.
Judgment affirmed.
POWELL, P.J., and VALEN, J., concur.