DECISION AND JUDGMENT ENTRY
{¶ 1} This case is before the court on appeal from a judgment of the Lucas County Court of Common Pleas.
 {¶ 2} On June 20, 2001, plaintiff-appellant, Lois H. Kastner, whose age is alleged to be 80 at the time, decided that she wanted to trade in her 1996 Lincoln Towne Car ("Towne Car") for a newer model. After visiting other automobile dealerships and not finding the color, cream, of the vehicle she wanted, appellant drove to appellee's place of business, Southside Lincoln-Mercury Sales, Inc. ("Southside"). *Page 2 
 {¶ 3} When appellant arrived at Southside, she was approached by Emitt B. Hall, a salesperson at the dealership. Hall showed her a cream-colored 2000 Towne Car that belonged to an individual who also worked at the dealership. Hall then told appellant that he could find the same car for her at auction and save her $3,000. Appellant agreed to attend the auction with Hall. At the auction, appellant believed that she purchased a cream-colored 2000 Towne Car.
 {¶ 4} Before the car was delivered, Hall called appellant every day and asked her for the purchase price, $18,000[1], of the vehicle. He later went to appellant's home, and she gave him the $18,000 in cash. Hall had a handwritten Southside "Buyer's Order" with him. He told appellant to sign the order, then he would rewrite it and save her $3,000.
 {¶ 5} Approximately six days later, Hall called appellant and told her to come to Southside. When she arrived, appellant was asked to sign a document identical to the first Buyer's Order, except for the fact that the terms were typed in by "Bill" at the dealership. According to appellant, Bill had no knowledge of the "arrangement" between herself and Hall because Hall expressly asked her to keep the details of their arrangement to herself. Appellant also entered into an agreement to finance the purchase of the Towne Car through Ford Motor Credit. Hall told appellant that: "[A]s soon as the financing went through, before [she] even got a payment book or anything, he would give *Page 3 
[appellant] the money to send in to pay it off, and that's some way he was going to save [her] $3,000."
 {¶ 6} Subsequent to the purchase and delivery of appellant's vehicle, Hall would call her and ask her to loan him some money. Some of the money was borrowed when appellant accompanied Hall to gambling casinos where appellant would sit and watch Hall gamble. The total amount of money given to Hall by appellant was $97,181.95, including the $18,000 in cash for the alleged purchase of her car.
 {¶ 7} Eventually, Richard Currey, Southside's owner until October 2002, learned, from a customer who came into the dealership, that he had given Hall money for the purchase of a motor vehicle and that Hall never delivered the vehicle. Currey reviewed the customer's sales worksheet. He then checked to see if the money given by the customer to Hall was ever submitted to "the office," presumably the accounting department. It had not been submitted. Currey went to his son, who was the general manger of the dealership at that time, told him to find Hall and to send him to Currey's office.
 {¶ 8} When Hall arrived at his office, Currey asked him whether he had taken the money from the customer. When Hall indicated that he did take the money, Currey immediately called the police. However, despite the fact that Currey wanted Hall arrested, the police told him that only the customer, the person who had been harmed, could have Hall arrested. The customer would not press charges, so Currey terminated Hall's employment. Currey later discovered four other customers, including Kastner, *Page 4 
who had given Hall money for his own benefit when each believed he or she was purchasing a vehicle from Southside.
 {¶ 9} Currey then contacted the dealership's insurance company and learned that it would settle any and all claims made as the result of Hall's actions. Upon receiving their refunds, the motor vehicle buyers, including Kastner, signed an agreement releasing Southside from liability. Kastner received $18,400 and signed a release of all claims against Southside.
 {¶ 10} Apparently, appellant commenced an action against Southside in 2002, but later voluntarily dismissed that case, without prejudice. On May 23, 2005, she filed the instant case against Southside. Her claims included: (1) Southside negligently hired/retained Hall as an employee; (2) Southside fraudulently induced appellant to sign a release of her claims against the dealership; and (3) Southside violated R.C. Chapter 1345, the Ohio Consumer Sales Practices Act. Southside filed an answer and a motion for summary judgment on all three claims. The motion for summary judgment was supported by appellant's deposition.
 {¶ 11} Appellant filed a memorandum in opposition supported by Richard Currey's deposition and a certified record of the state of Michigan showing that Hall was convicted of larceny by conversion in 1991 and placed on probation for five years. Appellant also filed a certified copy of a decision of the Sixth District Court, Eastern District of Michigan, revoking Hall's "supervised release" for a federal offense he committed in 1987. The decision does not state the exact nature of the offense. In *Page 5 
addition, appellant offered certified copies of the indictment and sentencing filed in the foregoing federal court in which Hall was convicted of wire fraud and perjury in 1994.
 {¶ 12} In her memorandum in opposition to the motion for summary judgment, appellant contended that, in Ohio, R.C. 4517.10 requires a motor vehicle salesperson to have a license and that appellant did not have a license during the relevant period. She supported her contention with the affidavit of the Ohio Registrar of the Bureau of Motor Vehicles who averred that a motor vehicle salesperson license was not issued in the name of "Emitt `Burt' Hall" in either 2000 or 2001. Appellant argued, in essence, that Southside knew or should have known that it was hiring a convicted felon who was an unlicensed salesperson and, therefore, negligently placed Hall in a position where he had contact with the public.
 {¶ 13} Finally, appellant relied on the affidavit of Ismael Ortiz, who accompanied appellant to Southside when she signed the release in exchange for the $18,400. Ortiz swore that appellant did not know what she was signing because Currey called the document a "receipt" and had appellant sign the release without allowing her to read it.
 {¶ 14} In his deposition, Currey testified that he knew Hall when they were both car salesmen, and that Hall had worked at Southside two or three times over a period of several years, the latest being Hall's hiring in June 1999. Currey further stated that he had no knowledge of the alleged fact that Hall was convicted in 1994 for wire fraud and perjury. Moreover, Currey pointed out that he had nothing to do with the hiring of sales personnel. That job was performed by the sales manager. The prospective employee was *Page 6 
required to fill out an application. The potential salesperson was also required to sign a "money laundering" form and an application for insurance benefits. When asked about the license renewal process for motor vehicle sales personnel, Currey replied that either the sales manager or office manager would mail in the licenses for all of the Southside's sales people, and the state of Ohio would mail the renewals back to the dealership.
 {¶ 15} On April 10, 2005, the trial court granted Southside's motion for summary judgment. Appellant timely appeals that judgment and asserts that the following error occurred in the proceedings below:
 {¶ 16} "The trial court erred in granting summary judgment."
 {¶ 17} Appellate courts review the grant of summary judgment de novo, applying the same standard used by the trial court. Grafton v. OhioEdison Co. (1996), 77 Ohio St.3d 102, 105, 1996-Ohio-336. Accordingly, an appellate court reviews the same evidence that was properly before the trial court. Am. Energy Servs., Inc. v. Lekan (1992),75 Ohio App.3d 205, 208. Summary judgment is proper when three conditions are satisfied: (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made. Civ.R. 56(C); Harless v. Willis Day Warehousing Co. (1976), 54 Ohio St.2d 64, 66.
 {¶ 18} Appellant first argues that the trial court erred in granting summary judgment to Southside on her claim of negligent hiring/negligent retention. In her *Page 7 
deposition, appellant testified that Currey told her that Hall was in "jail before." According to appellant, Currey "hired him back knowing that he had, I don't know how many years he served." Later in her deposition, appellant also stated that "they did wrong by hiring the man back who had already served time for doing this same thing years back." When asked whether she knew the exact nature of Hall's prior criminal conduct, appellant replied that Currey did not give her a specific answer, but she assumed that it was for "doing, you know, dirt to Dick Currey." Based upon these statements allegedly made by Currey, as well as Hall's criminal records, appellant contends that hiring and retaining someone like Hall to act as a salesman for Southside "were in and of themselves negligent acts and a proximate cause" of appellant's total losses ($97,181.95). Appellant therefore contends that the trial court erred in granting summary judgment to Southside on the basis that Hall's actions in "borrowing" money for gambling were outside the scope of his employment and, as a result, Southside could not be held liable for the stolen funds.
 {¶ 19} In any cause of action based upon negligence, a plaintiff must prove duty, breach, proximate cause, and damages. Abrams v.Worthington, 10th Dist. No. 05AP-912, 2006-Ohio-5516, ¶ 15. An employer is liable for negligent hiring and/or negligent retention when the employer elects to employ an individual who has a past history of criminal conduct which the employer had knowledge of or could have discovered through reasonable investigation. Byrd v. Faber (1991),57 Ohio St.3d 56, 62. *Page 8 
 {¶ 20} The knowledge of the employer is determined by examining a totality of the circumstances. Evans v. Ohio State Univ. (1996),112 Ohio App.3d 724, 742, citing Feichtner v. Cleveland (1994),95 Ohio App.3d 388, 396. The totality of the circumstances must be "somewhat overwhelming" before an employer can be held liable for the criminal conduct of the employee. Id. The mere fact that criminal misconduct on the part of an employee may be foreseen does not, in and of itself, suffice to place the responsibility upon his employer. Id. at 740, quoting Prosser Keeton, Law of Torts (5 Ed.1984) 305, Section 42. Only where the misconduct can be anticipated and the taking of the risk of that misconduct was unreasonable, can liability be imposed upon the employer. Id., quoting Prosser Keeton at 313. See, also, Staten v.Ohio Exterminating Co., Inc.(1997), 123 Ohio App.3d 526, 530.
 {¶ 21} We shall first address the issue of whether a question of fact exists with regard to whether Southside can be potentially held liable under the theory of negligent hiring/retention for Hall's criminal conduct in what amounted to stealing $18,000 from appellant.
 {¶ 22} As applied to the present case, it is undisputed that R.C.4517.10 requires all motor vehicle salespersons to have a license, which must be renewed annually. At the very least, Southside should have known that Hall did not have such a license during the relevant time period. Furthermore, appellant provided testimony indicating that Currey had knowledge of the fact that Hall engaged in similar criminal conduct in the past. While Currey denied knowing anything pertaining to Hall's prior criminal activities, a *Page 9 
background check would have revealed Hall's criminal record. Thus, a question of fact does exist on the issue of whether Southside could have anticipated Hall's criminal activities and taken an unreasonable risk of misconduct with regard to Hall's taking of appellant's $18,000. Nonetheless, because Hall's actions in taking $97,181.79 (including the $18,000) from appellant consisted of intentional, criminal misconduct that occurred while Hall was acting outside the scope of his employment, Southside cannot be found liable for negligent hiring and/or negligent retention.
 {¶ 23} An employee's conduct is within the scope of his employment if it is of the kind which he is employed to perform, occurs substantially within the authorized limits of time and space, and is actuated, at least in part, by a purpose to serve his employer. Anderson v.Toeppe (1996), 116 Ohio App.3d 429, 436. In other words, when the employee's misconduct is intentional, it must be done to facilitate or promote the employer's business in order for liability to attach.Groob v. KeyBank, 108 Ohio St.3d 348, 2006-Ohio-1189, ¶ at 42 (citations omitted). See, also, Byrd v. Faber, 57 Ohio St.3d at 59 ("[A]n employer is not liable for the independent self-serving acts of his employees which in no way facilitate or promote his business.").
 {¶ 24} In the case under consideration, the undisputed facts reveal that Hall's intentional criminal conduct was not, in any way, actuated for the purpose of serving Southside. Taking appellant to an auction to find a cream-colored Towne Car, then taking her $18,000 in cash and enticing her into signing a credit agreement for Southside were all self-serving acts intended solely for Hall's own benefit. In fact, Southside lost *Page 10 
both financially and with regard to its reputation as the result of Hall's criminal conduct in taking appellant's $18,000.
 {¶ 25} Furthermore, Hall was clearly not facilitating or promoting Southside's business when he "borrowed" $79,181.79 from appellant for his own personal reasons, including the funds he used to gamble. Accordingly, we find that the trial court did not err in granting summary judgment to Southside on appellant's claim of negligent hiring/retention.
 {¶ 26} In her second contention, appellant maintains that the release she signed was obtained without consideration and through misrepresentation and is, therefore, void. Appellant asserts that there was a lack of consideration for the release because it was the return of her own money. She also claims that the release was obtained by fraudulent means because Currey described it as a "receipt" and did not allow her enough time to read the document.
 {¶ 27} When a party agrees to release a claim in exchange for consideration, any and all claims encompassed in the release are barred unless the release is without consideration or was obtained by fraud.Haller v. Borror Corp. (1990), 50 Ohio St.3d 10, 13. In the present case, Southside gave appellant $18,400 in exchange for the release. This was not a return of any monies owed by Southside to appellant. Appellant's $18,000 was taken by Hall. Furthermore, the release signed by appellant expressly states that the $18,400 is "in consideration of Lois H. Kastner's releasing Southside Lincoln-Mercury *Page 11 
Sales from all claims * * *. Consequently, we find that there was consideration for the release. See Cole v. Temple Israel, 9th Dist. No. 23243, 2007-Ohio-245, ¶ 14.
 {¶ 28} Appellant next argues that the release was fraudulently obtained because Currey called it a "receipt;" therefore, appellant did not realize that she was settling and releasing any claim that she might have against Southside. A party is bound by the provisions of a contract, including a release, that the party has signed. Haller v.Borror Corp., 50 Ohio St.3d at 14; Alton v. Wyland (1991),72 Ohio App.3d 685, 689 (citations omitted). However, appellant maintains that her signature was obtained by fraud in the factum, and is, as a result, void.
 {¶ 29} Fraud in the factum occurs when the "intentional act or misrepresentation of one party precludes a meeting of the minds concerning the nature or character of the purported agreement."Haller at 14. To constitute fraud in the factum "the actions or representations of the releasee so impair the mind and judgment of the releasor that [s]he fails to understand the nature or consequence of h[er] release * * *." Id. at 13. Nevertheless, even if there is a mere misrepresentation by the releasee as to the nature of the release, "the agreement is not void for fraud in the factum when the releasor has an opportunity to read and understand the document before execution."
 {¶ 30} Even if we would agree that calling the release signed by appellant a "receipt" was a misrepresentation, the document speaks for itself. It is clearly captioned as a "Compromise Settlement and Mutual Release." The term, "release," is used throughout the document a number of times, and appellant indicated in her deposition *Page 12 
testimony that she knew that she was required to sign this document in order to receive the $18,400. As quoted in Haller at 14, "[a] person of ordinary mind cannot say that he was misled into signing a paper which was different from what he intended to sign when he could have known the truth by merely looking when he signed. * * *." (Citation omitted.) Accordingly, appellant's second contention is meritless.
 {¶ 31} Appellant's third argument urges that the trial court erred in granting summary judgment on her claims brought pursuant to R.C. Chapter 1345, the Ohio Consumer Sales Practices Act. In her complaint, appellant alleged that Southside failed to deliver the Towne Car that she purchased at auction and failed to provide her with a fair and clear title. Appellant, however, failed to offer any evidence to create a question of fact as to whether Southside engaged in any unfair, deceptive, or unconscionable act within the meaning or R.C. 1345.02 and1345.03.
 {¶ 32} On the issue of whether appellant was provided with the wrong vehicle by Southside, she claims that the car at the auction did not have two burn holes in the interior and that the mileage was different. Nonetheless, in her deposition, appellant admitted that she did not obtain the vehicle identification number on the vehicle that she saw at the auction. She also admitted that she did not inspect the Towne Car that she picked up at Southside prior to taking possession. She did sign an affidavit certifying the mileage on the Towne Car that was delivered at the dealership. There is also no evidence that there was a lien on the automobile, except the one that Hall, through his intentional criminal conduct, persuaded appellant into signing. Further, once Southside provided her *Page 13 
with the $18,400 to pay off the amount owed to Ford Motor Credit, appellant held a free and clear title. Based upon the foregoing, we find that the trial court did not err in finding that no question of fact existed on appellant's third assertion.
 {¶ 33} Accordingly, the trial court properly granted summary judgment to Southside as a matter of law, and appellant's sole assignment of error is, therefore, found not well-taken. The judgment of the Lucas County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4.
Peter M. Handwork, J., Mark L. Pietrykowski P.J., William J. Skow, J., CONCUR.
[1] Appellant was allowed $16,000 on the trade in of her 1996 Towne Car. *Page 1